SOCIALIST WORKERS PARTY v SECRETARY OF STATE

Docket No. 65466. Argued January 8, 1981 (Calendar No. 11).—Decided March 1, 1982.

The Socialist Workers Party, and one of its members, Andrew Walden, who is a prospective candidate for political office, and three voters who are not affiliated with the party brought an action against the Secretary of State for a declaratory judgment that an amendment to the Election Law which requires a new political party both to file a petition meeting certain requirements and to receive a minimum vote in the primary election in order to qualify for a place on the general election ballot, violates the First and Fourteenth Amendments of the United States Constitution and the state Constitution. The Wayne Circuit Court, Robert J. Colombo, J., granted the defendant's motion for accelerated judgment on the ground of res judicata, because in 1976 the United States District Court for the Eastern District of Michigan had decided, in an action which included the Socialist Workers Party as a plaintiff, that the statute did not violate the federal constitution. The plaintiffs appeal prior to decision of the Court of Appeals.

In an opinion by Justice Fitzgerald, joined by Justices Kavanagh, Levin, Ryan, and Moody, the Supreme Court held:

The plaintiffs' action is not precluded by the doctrine of res judicata; the statute violates the First and Fourteenth Amendments to the United States Constitution and the Equal Protection Clause of the state Constitution, and exceeds the constitu-

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 4-6, 8-15, 18] 16A Am Jur 2d, Constitutional Law § 545.

    25 Am Jur 2d, Elections §§ 117, 128, 130, 175.

[2] 46 Am Jur 2d, Judgments §§ 438, 444.

[3,4] 46 Am Jur 2d, Judgments §§ 402, 438.

[4] 26 Am Jur 2d, Elections §§ 253, 357.

[5] 25 Am Jur 2d, Elections § 5.

[7] 16 Am Jur 2d, Constitutional Law § 253.

[16-18] 20 Am Jur 2d, Courts §§ 193, 201.

    Binding effect upon state courts of opinion of United States Supreme Court supported by less than all its members. 65 ALR3d 504.

tional authority of the Legislature to enact election laws because it imposes unreasonable and unnecessary restrictions on access to the general election ballot.

1. Relitigation of an issue of law in a subsequent action between the same parties is not precluded by the doctrine of res judicata where a new determination is warranted to take account of an intervening change in the applicable law or to avoid inequitable administration of the laws. A rule of law declared in an action between two parties should not be binding on them for all times, especially as to claims arising after the first proceeding, when other litigants are free to urge that the rule should be rejected. The preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants.

2. The issue previously decided in the federal case was one of law; since then the Supreme Court of the United States has declared that the state's interest in effective regulation of elections must be balanced against the public's interest in the dissemination of ideas by minor political parties. The federal district court did not balance those interests. When the federal court made its decision in 1976, it found that more new political parties sought to qualify by the petition method that it was possible for voting machines to handle, and that most precincts in Michigan were using voting machines. The precincts which use electronic voting (punch cards), which can accommodate any number of political parties, now outnumber those which use voting machines. To the extent that the federal court relied on the large number of precincts using voting machines, that ground for its decision has been eroded. Moreover, in this case the plaintiffs challenge the statute on the ground that it is unconstitutional "as applied" during the elections of 1978 and 1980, an issue reserved by the federal district court in its 1976 decision. The factual posture of the federal case did not present an "as applied" situation. Therefore, the doctrine of res judicata should not be applied in this case.

3. In determining whether a statute restricting access to the general election ballot violates the First and Fourteenth Amendments, the Court must examine the character of the classification in question, the importance of the individual interests at stake, and the state's interests asserted in support of the classification. The statute challenged in this case distinguishes between new political parties and parties entitled to automatic placement on the general election ballot. Both the

rights of individuals to associate for the advancement of political beliefs and of qualified voters to cast their votes effectively are basic to effective political expression and merit strong constitutional protection. Restrictions on access to the ballot burden those fundamental rights directly, and the effect is heightened where the restrictions work to eliminate political and ideological alternatives at the primary election when the candidates for the major parties are selected and before campaigning has identified and sharpened the issues facing the voters.

4. In 1980, the Socialist Workers Party was excluded from the general election ballot by operation of the statutory requirement of obtaining a certain number of votes in the primary to qualify as a new political party. The plaintiff party and a party member claim a denial of their right to associate; the other plaintiffs seek relief as voters denied effective expression of political preference. In an equal protection challenge to a statute which restricts access to the ballot the plaintiffs have the burden of demonstrating a discrimination of some substance before the test of a compelling state interest applies. The plaintiffs have met that burden.

5. The state has a compelling interest in the protection of the integrity of its election process. Regulation of elections by effectively restricting access to the ballot is constitutionally permissible. Prevention of the clogging of the state's election machinery and avoidance of confusion of the voters are legitimate objects of regulation. However, even when pursuing that legitimate interest, a state may not choose means that unnecessarily restrict constitutionally protected liberty; in addition, it is required to adopt the least drastic means to achieve the end.

6. The defendant argues that legitimate state interests in prevention of clogging of the election machinery and avoidance of confusion of the voters are furthered if no more than nine parties with straight-ticket voting are allowed on the general election ballot, the limit of voting machines. However, the statute has operated to eliminate four new parties from the 1978 and 1980 general election before the nine-party capacity of the voting machine was reached. The premature elimination of parties is inconsistent with the claimed legislative judgment about when the evils sought to be prevented should be addressed. It follows immediately that the statute, as it has been applied, does not use the least drastic means to avoid unreasonable burdens on the plaintiffs' constitutionally protected liberty. Further, because the statute does not rule out the possibility of more than nine parties qualifying for the general elec-

tion, the restriction imposed is not necessary to serve the claimed interest.

7. In sum, the statute misses the mark; the integrity of the election process is therefore not furthered by the requirement. By operation of the statute, the plaintiff Socialist Workers Party did not appear on the general election ballot in 1978 and 1980. The plaintiffs Socialist Workers Party and the party member, Walden, were thereby denied their right to associate in violation of the First and Fourteenth Amendments. The right of the other three plaintiffs to vote was also impermissibly impaired in violation of the First and Fourteenth Amendments.

8. The Legislature has the constitutional authority to enact laws to preserve the purity of elections; any statute which adversely affects that purity is constitutionally infirm. One of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear on the ballot. It would be anomalous to require that equality and not to limit the Legislature's ability to block access to the ballot. The purity of elections unmistakably requires fairness and evenhandedness in the election laws of the state.

9. Equality for all candidates whose names appear on the ballot would be a hollow right if the Court were to allow unfair restrictions indirectly to deny the plaintiffs placement on the ballot. The primary voting procedure in this case imparts a substantial unfair advantage to political parties entitled to automatic placement on the general election ballot. Such parties need not expend valuable time and resources on educating the voters on how to cast an effective vote in the primary. The names of their candidates appear on the primary ballot, unlike the names of the candidates of the new parties, and they are free to devote all of their energies to their political messages. Therefore, the election procedure created by the statute is inconsistent with the constitutional goal of equality of treatment of parties and candidates seeking access to the general election ballot and violates the constitutional "purity of elections" clause.

10. The statute violates the Equal Protection Clause of the Michigan Constitution for the same reasons that it violates the federal constitution.

Reversed and remanded for further proceedings.

Chief Justice Coleman, joined by Justice Williams, dissented. The summary affirmance by the Supreme Court of the United States in the 1976 federal case in which the Socialist Workers

Party was a plaintiff is a precedent binding on the Supreme Court of Michigan, and forecloses review of the federal constitutional issue. The Supreme Court of the United States has said repeatedly that summary affirmances or dismissals for want of a substantial federal question are decisions on the merits and must be given weight as precedent. Such summary dispositions reject the specific challenges presented in the statement of jurisdiction and leave undisturbed the judgment appealed from. They prevent lower courts from coming to opposite conclusions on the precise issues necessarily decided by those actions. The federal constitutional issue necessarily decided by summary affirmance in the 1976 federal case is the precise issue in this case. The jurisdictional statement in the federal case shows that the attack was on the election statute both "on its face" and "as applied". While the appellants contend that a new issue, an "as applied" attack, is raised in this case, the analysis by the Court in this case is "facial", and both grounds were raised in the prior federal case.

### OPINION OF THE COURT

1. ELECTIONS — CONSTITUTIONAL LAW — POLITICAL PARTIES — QUALIFICATIONS — STATUTES.

    The provision of the Election Law which requires a new political party to file a petition meeting certain requirements and to obtain a minimum vote in the primary election before it may qualify for a place on the general election ballot violates the First and Fourteenth Amendments to the United States Constitution and the Equal Protection Clause of the Michigan Constitution, and exceeds the constitutional authority of the Legislature to enact election laws (US Const, Ams I, XIV; Const 1963, art 1, § 2; art 2, § 4; MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

2. JUDGMENTS — RES JUDICATA — ISSUES OF LAW.

    Relitigation of an issue of law in a subsequent action between the same parties is not precluded by the doctrine of res judicata where a new determination is warranted to take account of an intervening change in the applicable law or to avoid inequitable administration of the laws.

3. JUDGMENTS — RES JUDICATA — ISSUES OF LAW.

    A rule of law declared in an action between two parties should not be binding on them for all times, especially as to claims arising after the first proceeding, when other litigants are free to urge that the rule should be rejected.

4. ELECTIONS — CONSTITUTIONAL LAW — STATUTES — JUDGMENTS — RES JUDICATA.

   The doctrine of res judicata does not preclude an action to challenge a provision of the Election Law as unconstitutionally restricting the access of new political parties to the general election ballot where the decision in a prior action between the same parties did not consider the public's interest in the dissemination of ideas by minor political parties, but relied on then-existing number of precincts using voting machines which can accommodate only a limited number of political parties, and reserved the question, raised in the subsequent action, of the constitutionality of the statute as it applied to the plaintiffs in subsequent elections (MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

5. ELECTIONS — CONSTITUTIONAL LAW — FIRST AMENDMENT — FOURTEENTH AMENDMENT — STATUTES.

   To determine whether a statute restricting access to the general election ballot violates the First and Fourteenth Amendments, the court must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification (US Const, Ams I, XIV).

6. ELECTIONS — CONSTITUTIONAL LAW — CIVIL RIGHTS.

   The rights of individuals to associate for the advancement of political beliefs and of qualified voters to cast their votes effectively both are basic to effective political expression and merit strong constitutional protection; restrictions on access to the ballot burden those fundamental rights directly (US Const, Ams I, XIV).

7. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — STATUTES.

   Plaintiffs challenging a statute which restricts access to the ballot on the ground that it violates the Equal Protection Clause have the burden of demonstrating a discrimination of some substance before the state must establish that the statutory classification is necessary to serve a compelling state interest (US Const, Am XIV; Const 1963, art 1, § 2).

8. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — STATUTES.

   A plaintiff political party which was excluded from the general election ballot in 1980 by operation of the statutory requirement that a new political party must file a petition meeting

certain requirements and must obtain a certain number of votes in the primary election, a member of the political party who claims a denial of the right to associate, and other plaintiffs who seek relief as voters denied effective expression of political preference, have demonstrated sufficient discrimination so that the state must establish that the statutory classification is necessary to serve a compelling state interest (US Const, Ams I, XIV; Const 1963, art 1, § 2; MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

9. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — STATUTES.

The state has a compelling interest in the protection of the integrity of its election process; regulation of elections by effectively restricting access to the ballot is constitutionally permissible, and prevention of the clogging of the state's election machinery and avoidance of confusion of the voters are legitimate objects of regulation (US Const, Ams I, XIV; Const 1963, art 1, § 2).

10. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — STATUTES.

A state may not choose means that unnecessarily restrict constitutionally protected liberty even when pursuing a compelling interest in protecting the integrity of its elections; it is required to adopt the least drastic means to achieve the end (US Const, Ams I, XIV; Const 1963, art 1, § 2).

11. ELECTIONS — CONSTITUTIONAL LAW — INTEGRITY OF ELECTIONS.

Restrictions on access of new political parties to the general election ballot in order to limit the number of parties to the capacity of voting machines, nine parties, were not the least drastic means to further the state's interest in the integrity of elections where the restrictions operated to eliminate new parties from the ballot before the nine-party capacity of the machines was reached, and were not rationally related to the interest where, because the restrictions were tied to success in the primary election and not to machine capacity, they did not rule out the possibility of more than nine parties qualifying for the general election (US Const, Ams I, XIV; Const 1963, art 1, § 2; MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

12. ELECTIONS — CONSTITUTIONAL LAW — STATUTES — PURITY OF ELECTIONS.

The Legislature has the constitutional authority to enact laws to

preserve the purity of elections; any statute which adversely affects that purity is constitutionally infirm (Const 1963, art 2, § 4).

13. Elections — Constitutional Law — Statutes — Purity of Elections.

It would be anomalous for the constitution to require equality of treatment for all candidates whose names appear on the ballot and not to limit the Legislature's ability to block access to the ballot; the concept of purity of elections unmistakably requires fairness and evenhandedness in the election laws of the state (Const 1963, art 2, § 4).

14. Elections — Constitutional Law — Statutes — Purity of Elections.

The Legislature may regulate the ability or failure of a political party or candidate to gain access to the ballot; however, it may not use unfair restrictions indirectly to deny a political party or candidate placement on the ballot (Const 1963, art 2, § 4).

15. Elections — Constitutional Law — Statutes — Purity of Elections.

The provision of the Election Law which requires a new political party to file a petition meeting certain requirements and to obtain a minimum vote in the primary election before it may qualify for a place on the general ballot imparts a substantial unfair advantage to political parties entitled to automatic placement on the general election ballot; therefore, the statute violates the constitutional authority of the Legislature to enact election laws (Const 1963, art 2, § 4; MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

Dissenting Opinion by Coleman, C.J.

16. Courts — Supreme Court of the United States — Summary Disposition — Precedent.

*Summary affirmances or dismissals for want of a substantial federal question by the Supreme Court of the United States are decisions on the merits and must be given weight by all lower courts as precedents on the precise issues necessarily decided.*

17. Courts — Supreme Court of the United States — Summary Disposition — Questions Decided.

*A summary disposition by the Supreme Court of the United States rejects the specific challenges presented in the statement of jurisdiction filed under the Supreme Court Rules, and pre-*

vents lower courts from coming to opposite conclusions on the precise issues necessarily decided.

18. ELECTIONS — CONSTITUTIONAL LAW — EQUAL PROTECTION — STATUTES.

Summary affirmance by the Supreme Court of the United States of a decision by a three-judge panel of a United States District Court that the provisions of the Michigan Election Law relating to requirements for a new political party to be put on the ballot are not unconstitutional necessarily decided the issue of constitutionality, both "facial" and "as applied", where the jurisdictional statement filed by the appellants shows that both "facial" and "as applied" constitutionality was challenged, and that decision is precedent binding on the Supreme Court of Michigan (US Const, Ams I, XIV; MCL 168.560a, 168.560b, 168.685; MSA 6.1560[1], 6.1560[2], 6.1685).

*Reosti & Papakhian* and *Margaret Winter* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Jann Ryan Baugh* and *Gary P. Gordon,* Assistants Attorney General, for defendant.

Amicus Curiae:

*Maurice Kelman* for Metropolitan Detroit Branch, American Civil Liberties Union of Michigan.

FITZGERALD, J. This is an appeal from a circuit court order granting defendant's motion for accelerated judgment on the ground of res judicata. Plaintiffs'[1] complaint presented both federal and state constitutional challenges to the statute by which candidates for political office qualify for the general election ballot.

---

[1] Plaintiffs are a minority political party, the Socialist Workers Party, a party member and prospective candidate for political office (Walden) and three Michigan voters who are not affiliated with the party (Lafferty, Moore and Reed).

I

In 1976 PA 94,[2] the Legislature amended Michigan's election law. In part, that act directs a new political party[3] to meet both a petition requirement[4] and a minimum primary vote requirement of 3/10 of 1% of the total votes cast[5] before it may qualify for a place on the general election ballot. Prior to 1976 PA 94, a new political party qualified for the general election ballot merely by satisfying a petition requirement substantially identical to that now required for placement on the primary election ballot.[6] 1976 PA 94 also specifies that new political parties appear on the primary election ballot in a separate column or row,[7] that the names of the new political parties follow the statement, "I desire that the party indicated shall have its name, party vignette, and candidates listed on the next general election ballot",[8] and that voters may vote for the candidates of one political party only or for the appearance of one new political party on the general election ballot.[9] The Legislature provided that the act take effect immediately. The act was approved on April 22, 1976.

[2] 1976 PA 94 amends MCL 168.685; MSA 6.1685 and adds MCL 168.560a and 168.560b; MSA 6.1560(1) and 6.1560(2).

[3] A new political party is defined as a party whose principal candidate "received a vote equal to less than 1% of the total number of votes cast for the successful candidate for the office of secretary of state at the last preceding election in which a secretary of state was elected". MCL 168.685(3); MSA 6.1685(3). 1976 PA 94 did not substantively change the statutory definition of new political party. Such a definition is appropriate for both newly formed and previously existing (as is the Socialist Workers Party) political parties.

[4] MCL 168.685(1); MSA 6.1685(1).

[5] MCL 168.560b(4); MSA 6.1560(2)(4).

[6] 1973 PA 28, MCL 168.685; MSA 6.1685.

[7] MCL 168.560b(1); MSA 6.1560(2)(1).

[8] MCL 168.560b(2); MSA 6.1560(2)(2).

[9] MCL 168.560b(3); MSA 6.1560(2)(3).

In 1976, after the passage of 1976 PA 94, several individuals and political parties (including plaintiff Socialist Workers Party) filed suit in federal district court alleging that the addition of the primary vote requirement violated the First and Fourteenth Amendments. The court in *Hudler v Austin,* 419 F Supp 1002 (ED Mich, 1976), *aff'd sub nom Allen v Austin,* 430 US 924; 97 S Ct 1541; 51 L Ed 2d 769 (1977), held that the act did not violate the federal constitution, Judge John Feikens dissenting. Nevertheless, the court found that the act was passed too late to give the affected political parties time to gather additional primary support and ruled that "new" parties which had satisfied the petition requirement but not the primary vote requirement appear on the general election ballot. The United States Supreme Court affirmed summarily, with Justices Stewart, Blackmun, and Powell voting to give the case plenary consideration.[10]

In the case at bar, plaintiffs filed an action for declaratory judgment in Wayne Circuit Court on

[10] Plaintiffs' jurisdictional statement alleged facial and "as applied" unconstitutionality. However, the district court's order that the "new" parties appear on the 1976 ballot made moot, as a factual matter, the "as applied" challenge. The precise issue presented and necessarily decided by the summary affirmance was the facial constitutional question.

Furthermore, at the time the challenge was brought in the trial court, the primary vote requirement had not yet barred any political party from the ballot. Thus, the factual posture of the *Hudler* case in the federal district court did not present an "as applied" situation. Nor did the lower court's analysis directly and specifically address the as applied question other than in the narrow sense of determining that the act had been passed too late to give the affected parties sufficient time to adjust to its provisions. In contrast, this Court's current consideration of the constitutionality of PA 94 occurs against a background of two elections, in 1978 and 1980, in which several political parties were in fact denied ballot access because they failed to meet the primary vote requirement. Thus, the precedential effect of *Hudler* does not dispose of the "as applied" constitutionality challenge now raised in this Court.

April 22, 1980. Plaintiffs sought a declaration that 1976 PA 94 violates the First and Fourteenth Amendments and Const 1963, art 1, §§ 1, 3 and 5. An amended complaint added the allegations that the act violates Const 1963, art 1, § 2 and art 2, § 4.[11]

Defendant responded with a motion for accelerated judgment under GCR 1963, 116.1(5). Defendant's motion was premised on the theory that the prior judgment in *Hudler v Austin, supra,* precluded plaintiff's action. Judge Robert J. Colombo granted the motion from the bench on May 22, 1980, although expressing personal agreement with the reasoning in Judge Feikens' dissent.

We granted plaintiffs' application for leave to appeal prior to a decision by the Court of Appeals and the motion to file a brief amicus curiae by the Metropolitan Detroit Branch of the American Civil Liberties Union of Michigan. We directed the parties include among the issues to be briefed (1) whether the current federal constitutional challenge to 1976 PA 94, amending MCL 168.685; MSA

[11] Plaintiffs sought permanent and preliminary injunctive relief enjoining defendant Secretary of State from enforcing the provisions of 1976 PA 94 so as to exclude the Socialist Workers Party from the November 1980 general election ballot. Plaintiffs' brief to this Court, received on November 5, 1980, the day after the general election, understandably abandons the request for injunctive relief.

The fact that the election has taken place does not render moot this controversy. The challenged statutory classification will affect "new" political parties in future elections. Typically, these parties will raise the issue after a primary election in August. As here, they will rarely obtain appellate review before the general election takes place in early November. This, then, presents the classic situation where a controversy is " 'capable of repetition, yet evading review' ". *Storer v Brown,* 415 US 724, 737, fn 8; 94 S Ct 1274; 39 L Ed 2d 714 (1974), quoting *Rosario v Rockefeller,* 410 US 752, 756, fn 5; 93 S Ct 1245; 36 L Ed 2d 1 (1973); *Dunn v Blumstein,* 405 US 330, 333, fn 2; 92 S Ct 995; 31 L Ed 2d 274 (1972); *Moore v Ogilvie,* 394 US 814, 816; 89 S Ct 1493; 23 L Ed 2d 1 (1969); *Southern Pacific Terminal Co v Interstate Commerce Comm,* 219 US 498, 515; 31 S Ct 279; 55 L Ed 310 (1911).

6.1685 and adding MCL 168.560a and 168.560b; MSA 6.1560(1) and 6.1560(2), is precluded by *Hudler v Austin,* 419 F Supp 1002 (ED Mich, 1976), aff'd sub nom *Allen v Austin,* 430 US 924; 97 S Ct 1541; 51 L Ed 2d 769 (1977); (2) whether 1976 PA 94 infringes the First and Fourteenth Amendment rights of "new" political parties, their adherents and supporters, or the public in general; and (3) whether 1976 PA 94 violates rights guaranteed by the Michigan Constitution. 409 Mich 896 (1980).

We hold that plaintiffs' action is not precluded by the decision in *Hudler v Austin, supra.* We further hold that 1976 PA 94 violates the First and Fourteenth Amendments and Const 1963, art 1, § 2, and art 2, § 4. Accelerated judgment for defendant reversed and the matter remanded to the circuit court for proceedings in accordance with this opinion.

## II

Judge Colombo granted defendant's motion for accelerated judgment on the ground of res judicata. Defendant argues that the motion was properly granted because plaintiff Socialist Workers Party, an unsuccessful party plaintiff in *Hudler,* is merely attempting to relitigate the identical issue addressed by the *Hudler* court: the constitutionality of 1976 PA 94.

The doctrine of res judicata operates to prevent the relitigation of facts and law between the same parties or their privies. *Gose v Monroe Auto Equipment Co,* 409 Mich 147, 161; 294 NW2d 165 (1980). The plea of res judicata applies to points previously litigated and decided as well as to points " 'which properly belonged to the subject of

litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time' ". *Gursten v Kenney,* 375 Mich 330, 335; 134 NW2d 764 (1965), quoting with approval from *Henderson v Henderson,* 3 Hare 100, 115; 67 Eng Rep 313 (1843).

There are exceptions to the doctrine, such as found in Restatement Judgments, 2d (Tentative Draft No 1, 1973), § 68.1, pp 170-171:

"Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances.

\* \* \*

"(b) The issue is one of law and \* \* \*

\* \* \*

"(ii) A new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws \* \* \*."

The purpose of this section is explained by the commentary:

"A rule of law declared in an action between two parties should not be binding on them for all time, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected. Such preclusion might unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position."

See *Young v Detroit City Clerk,* 389 Mich 333; 207 NW2d 126 (1973).

The issue facing the Hudler court was one of law, the constitutionality of 1976 PA 94. Moreover, as plaintiffs and amicus ACLU correctly aver, the applicable legal context for the decision has changed. The *Hudler* court applied the "significant modicum of support" test, *Jenness v Fortson,* 403 US 431; 91 S Ct 1970; 29 L Ed 2d 554 (1971), in the following context:

"The facts and circumstances underlying the passage of Public Act 94 may be summarized as follows: (1) over a ten-year period, the petition requirement for ballot access, standing alone, proved to be an imprecise tool for measuring true voter support; and (2) in 1976, more new parties sought to qualify by the petition method than it was technically possible for the state's voting machines to handle. Of Michigan's 6,972 precincts, 4,322 are serviced by voting machines." *Hudler,* 419 F Supp 1008.

In upholding the constitutionality of the act, the *Hudler* court did not balance the state's interest in effective regulation of elections against the public's interest in the dissemination of ideas by minor political parties. *Illinois State Board of Elections v Socialist Workers Party,* 440 US 173; 99 S Ct 983; 59 L Ed 2d 230 (1979), since decided, establishes that the burden on the public's interest in the dissemination of ideas must also be assessed.

"The States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation. Abolitionists, Progressives, and Populists have undeniably had influence, if not always electoral success. As the records of such parties demonstrate, an election campaign is a means of disseminating ideas as well as attaining political office. * * * Overbroad restrictions on ballot access jeopardize this form of political expression." 440 US 185-186.

In addition, electronic voting precincts, the so-called punch card precincts, now outnumber voting machine precincts 2,982 to 2,873. Like the old-fashioned paper ballots still in use in 573 precincts, the punch card ballots can physically accommodate any number of parties.[12] To the extent the *Hudler* court relied on the actual number of voting machine precincts in support of the compelling state interests alleged, such reliance has been eroded.

Finally, our reading of the decision in *Hudler* convinces us that the district court reserved an "as applied" challenge to the constitutionality of 1976 PA 94 when it noted:

"It is impossible for this court or even the legislature to say in advance what the least drastic *effective* means of dealing with this problem would be. There is no one solution, and what works or doesn't work will always be a hindsight conclusion. The role of the court is not to tell the legislature how to do it, but only in a proper case to indicate whether the method actually chosen offends the Constitution." 419 F Supp 1015-1016.

In the present case, plaintiffs allege "as applied" unconstitutionality based on their experience with the operation of the act during the 1978 and 1980 elections.

We hold, therefore, that the doctrine of res judicata should not be applied in the present case. The elements of § 68.1(b)(ii) of the Restatement are

[12] The Secretary of State, Elections Division, reports that in 1980 there were 2,982 electronic voting (punch card) precincts, 2,873 voting machine precincts, 573 paper ballot precincts and 755 absent voter counting boards. *Michigan Precinct Reports by Counties: As Reported by Local Clerks* (1980). Howard McCowan, Election Specialist of the Secretary of State's Elections Division, says that approximately half of the absent voter counting boards are believed to use the electronic voting system. Memorandum from Howard McCowan, Elections Division, Secretary of State, to Jacqueline B. Morse, Deputy Clerk, Supreme Court, June 17, 1981.

satisfied and the policy of its commentary is promoted by allowing these plaintiffs the opportunity to challenge the constitutionality of 1976 PA 94. Moreover, plaintiffs challenge the act on "as applied" grounds, an issue distinctly reserved by the *Hudler* court. We thus reach the merits of plaintiffs' complaint.

## III

Plaintiffs and amicus ACLU challenge the constitutionality of 1976 PA 94 by arguing that the act imposes both unreasonable and unnecessary restrictions on access to the general election ballot. We agree.

In determining whether a statute restricting general election ballot access violates the First and Fourteenth Amendments, "we must examine the character of the classification in question, the importance of the individual interests at stake, and the state interests asserted in support of the classification". *Illinois State Board of Elections v Socialist Workers Party*, 440 US 173, 183; 99 S Ct 983; 59 L Ed 2d 230 (1979).

The challenged act, 1976 PA 94, distinguishes between statutorily defined "new" political parties and those parties entitled to automatic placement on the general election ballot. Prior to the enactment of 1976 PA 94, "new" political parties could secure a place on the November ballot by complying with a petition requirement. The petition requirement has been continued. However, "new" parties must satisfy the additional requirement of a minimum primary vote equal to 3/10 of 1% of the total votes cast in the primary. The primary ballot provides a separate column for "new" par-

ties. Voters are instructed to vote for candidates of one political party only *or* for one "new" political party. We do not doubt that a distinction based on prior electoral performance is valid in restricting access to the general election ballot. This, however, does not resolve whether the additional requirement of primary electoral success imposed by 1976 PA 94 is a constitutionally permissible burden on the rights of plaintiffs.

Ballot access implicates two distinct fundamental rights, "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively". *Williams v Rhodes,* 393 US 23, 30; 89 S Ct 5; 21 L Ed 2d 24 (1968). Although neither of these rights is expressly named in the constitution, both are basic to effective political expression and merit strong constitutional protection.

Restrictions on access burden these fundamental rights directly. A political party denied access to the ballot is not an effective device for advancing the ideas or political aspirations of its adherents. As a result, access restrictions operate to deter membership and participation in the excluded political association. Voters, faced with statutorily limited ballot choices, may find exercise of the right to vote a Hobson's choice and not an expression of political preference, the bedrock of self-governance. This effect is heightened where, as here, restrictions on access work to eliminate political and ideological alternatives at the time major party candidates are selected and before campaigning has identified and sharpened the issues facing the electorate.

In 1980, the Socialist Workers Party was excluded from the November ballot by operation of the primary vote requirement in 1976 PA 94. Plaintiffs Socialist Workers Party and party member Walden press their claims in the context of a denial of their right to associate. Plaintiffs Lafferty, Moore and Reed seek relief as voters denied effective expression of political preference. In an equal protection challenge to a ballot-restricting statute, plaintiffs have the burden of demonstrating a discrimination "of some substance" before the compelling state interest test is triggered. *American Party of Texas v White,* 415 US 767, 781; 94 S Ct 1296; 39 L Ed 2d 744 (1974). We conclude plaintiffs have met this burden.

Arrayed against the rights of individuals to vote and to associate effectively is the compelling interest of the state in the protection of the integrity of its election process. *American Party of Texas v White, supra,* 415 US 782, fn 14. Regulation of elections by restricting access to the ballot is constitutionally permissible. *Jenness v Fortson,* 403 US 431, 442; 91 S Ct 1970; 29 L Ed 2d 554 (1971). States may use means which are effective. *Storer v Brown,* 415 US 724, 736; 94 S Ct 1274; 39 L Ed 2d 714 (1974). Prevention of the clogging of a state's election machinery and avoidance of voter confusion are legitimate objects of state regulation on ballot access. *Bullock v Carter,* 405 US 134, 145; 92 S Ct 849; 31 L Ed 2d 92 (1972).

In *Illinois State Board of Elections v Socialist Workers Party, supra,* 440 US 184-185, the Court rearticulates the strict scrutiny standard of review in ballot access cases.

"When such vital individual rights are at stake, a

State must establish that its classification is necessary to serve a compelling interest. *American Party of Texas v White,* 415 US 767, 780-781 (1974); *Storer v Brown,* 415 US 724, 736 (1974); *Williams v Rhodes, supra,* 31." 440 US 184.

"[O]ur previous opinions have also emphasized that 'even when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty,' *Kusper v Pontikes,* 414 US 51, 58-59 [94 S Ct 303; 38 L Ed 2d 260] (1973), and we have required that States adopt the least drastic means to achieve their ends. *Lubin v Panish,* [415 US 709, 716; 94 S Ct 1315; 39 L Ed 2d 702 (1974)]; *Williams v Rhodes, supra,* 31-33. This requirement is particularly important where restrictions on access to the ballot are involved." 440 US 185.

We note at the outset that plaintiffs characterize the legislative scheme in 1976 PA 94 as a mere administrative convenience based on the mechanical limitations inherent in Michigan's voting machines.[13] Plaintiffs contend that this is the only state interest involved here and argue that it, standing alone, does not rise to the level of a compelling state interest. By contrast, defendant argues, as in 1976, that voting machine limitations further a compelling state interest in maintaining the integrity of this state's election process, *American Party of Texas v White, supra* (by prevention of the clogging of the state's election machinery and by avoidance of voter confusion, *Bullock v*

[13] The voting machines in use in Michigan have a nine-party capacity if a straight-ticket voting option is provided. Otherwise, the machines have a theoretical 360-candidate capacity. There are no technical difficulties in changing from straight-ticket voting to non-straight-ticket voting. However, in 1964 Michigan voters rejected a referendum on 1964 PA 240 which would have allowed non-straight-ticket voting. Memorandum from Howard McCowan, Elections Division, Secretary of State, to Jacqueline B. Morse, Deputy Clerk, Supreme Court, October 14, 1981. See Michigan Manual 1965-1966, p 478.

*Carter, supra),* and are therefore a proper focus for state regulation.

Even if, as defendant argues, 1976 PA 94 is justifiable by reference to the *Bullock* state interests,[14] we are required to inquire further. We must determine whether the primary vote requirement for "new" political parties is necessary to further the claimed interests and, thus, does not unnecessarily restrict plaintiffs' constitutionally protected liberty. We must also determine whether the Legislature adopted the least drastic means to achieve its objective, thereby avoiding unreasonable burdens on plaintiffs.

Because we conclude that the primary vote requirement is not necessary to serve the claimed interests and that the Legislature did not choose the least drastic means, we hold 1976 PA 94 violates the First and Fourteenth Amendments without reaching the question whether voting machine limitations, however labelled, qualify as a compelling state interest.[15]

As stated, a new political party must meet, *inter alia,* both petition and primary vote requirements.

[14] While the *Bullock* Court spoke in terms of *legitimate* state interests, the Court in *Jenness, supra,* identified an *"important* state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding voter confusion, deception and even frustration of the democratic process at the general election". 403 US 442. In *American Party of Texas v White, supra,* the Court described "preservation of the integrity of the electoral process and regulating the number of candidates on the ballot to avoid undue voter confusion" as compelling state interests. Thus, the interests identified by the defendant have been referred to in the context of legitimate, important, and compelling state interests. For the sake of consistency, we use the characterizations employed by the United States Supreme Court.

[15] It bears repeating that precincts using voting machines are now outnumbered by precincts capable of handling more than nine parties. However, we do not face, as did the *Hudler* court, assertions of the imminency of more than nine parties qualifying for the general election ballot.

This double requirement, defendant argues, represents the Legislature's judgment as to the most effective way to protect the integrity of this state's election process. The Legislature, defendant asserts, "enacted 1976 PA 94 to avoid the possibility, for example, of having so many parties and candidates that the voters would be unable to comprehend the ballots and the voting machines of the state would be physically unable to handle the sheer volume".[16]

Defendant thus argues that legitimate state interests in prevention of the clogging of this state's election machinery and in avoidance of voter confusion are furthered if no more than nine parties with straight-ticket voting are allowed.[17] Conceding for the sake of this argument that the limits of the capacity of voting machines do further these interests, a justifiable inference is that the evils sought to be addressed by the Legislature do not occur if nine *or fewer* parties are on the ballot. Significantly, there has been no allegation or showing to the contrary. Yet, the act operated to eliminate plaintiff political party from the 1980 general election ballot before the nine-party capacity of the voting machines was reached.[18] Such prema-

[16] Defendant's brief, p 11.

[17] This argument is tautologous, *i.e.,* defining a problem in terms of its solution. The "problems" are the prevention of the clogging of the election machinery and the avoidance of voter confusion. The "solution" is to equate the technological limitations of a machine with deterrence of the evils these legitimate state interests address. At the very least, such "machine logic" is intellectually unsatisfying.

[18] In the August 5, 1980 primary election, four "new" parties appeared on the party-qualification section of the ballot. The "votes" they received and the petition signatures they filed are shown.

| Party | Votes Received | Signatures Filed |
| --- | --- | --- |
| Libertarian Party | 5,250 | 26,494 |
| Socialist Workers | 825 | 26,146 |
| Citizens Party | 5,162 | 29,000 |
| Anderson Coalition | 93,497 | 62,252 |

A total of 1,175,292 voters went to the polls that day. 3/10 of 1% of

ture elimination is inconsistent with the claimed legislative judgment about when the evils sought to be prevented should be addressed. It follows immediately that the act, as it has been applied, does not use the least drastic means to avoid unreasonable burdens on plaintiffs' constitutionally protected liberty.[19]

Nor is it plausible to argue that the additional restriction on access is necessary to further the interests claimed. The primary vote requirement is tied to ballot success (3/10 of 1% of the primary votes cast) and not to the machines whose capacity it is claimed prevents voter confusion and the

this number is 3,526. Three of the "new" parties qualified for the general election ballot. One, the Socialist Workers Party, did not.
NOTE: Data from memorandum from Howard McCowan to Jacqueline B. Morse, June 17, 1981.

Parenthetically, in the August 8, 1978, primary election, three "new" parties appeared on the party-qualification section of the ballot. The "votes" they received and the petition signatures they filed are shown.

| Party | Votes Received | Signatures Filed |
|---|---|---|
| Socialist Workers | 419 | 23,184 |
| Communist Labor | 329 | 38,524 |
| U. S. Labor | 525 | 29,100 |

A total of 1,239,464 voters went to the polls that day. 3/10 of 1% of this number is 3,719. None of the new parties qualified for the general election ballot. See Michigan Manual 1979-1980, pp 595, 597.

[19] We note, without passing on the constitutionality of the election procedure created, that State Representative Jeffrey D. Padden offered an amendment to Senate Bill 1323 (1976), which was, relatively speaking, less drastic. Had the amending language been adopted, the statute would have imposed a primary vote requirement *only* if more than nine parties qualified for the general election ballot by prior election performance (MCL 168.560a; MSA 6.1560[1]) and petition (MCL 168.685; MSA 6.1685). In addition, the amendment tried to minimize the impact of 3/10 of 1% primary vote requirement by providing:

"If less than 9 parties qualify to appear on the general election ballot, the party or parties receiving the greatest number of votes under 3/10 of 1% shall qualify so that no less than 9 parties appear on the general election ballot." 1 Michigan House J (1976), p 1043.

The result of Representative Padden's amendment would have been a five-party election ballot in 1978 and a six-party election ballot in 1980.

clogging of the state's election machinery. As a result, the act does not rule out the possibility of *more* than nine parties qualifying for the general election ballot. Although the likelihood of such an event is remote, given the apparent stability of the major political parties, a political climate conducive to splintering the electorate could well bring in its train the very evils the act was allegedly designed to avoid but is powerless to prevent. Thus, the primary vote requirement is not necessary for, does not achieve, and is not even rationally related to the claimed state interests.

In sum, 1976 PA 94 misses the mark. To be sure, the Legislature may understandably and properly seek to maintain the integrity of Michigan's election process, *American Party of Texas v White, supra,* by preventing the clogging of the election machinery and by avoiding voter confusion. *Bullock v Carter, supra.* When this concern finds expression in restrictions on access to the general election ballot, the restrictions must be reasonable and not exceed what the compelling state interest actually requires. *Illinois State Board of Elections v Socialist Workers Party, supra,* 440 US 184-185. To require less would be to impose both unnecessary and unreasonable burdens on plaintiffs' fundamental rights to associate and to vote. In addition, over-broad restrictions on access put at risk the educational benefit to society as a whole which third parties have traditionally rendered. *Illinois State Board of Elections v Socialist Workers Party, supra,* 440 US 185-186.

We find that the primary vote requirement is not rationally related, much less necessary, to achieve the claimed legitimate state interests of prevention of the clogging of the state's election machinery, and avoidance of voter confusion. The

integrity of the election process is therefore not furthered by this ballot access requirement. In addition, we find that elimination of "new" political parties from the general election ballot before the evils sought to be addressed actually arise violates the requirement that plaintiffs' constitutionally protected liberty be burdened in the least drastic way. By operation of 1976 PA 94, plaintiff Socialist Workers Party did not appear on the general election ballot in 1980. We hold that plaintiffs Socialist Workers Party and party member Walden were thereby denied their right to associate in violation of the First and Fourteenth Amendments. We hold further that the right to vote of plaintiffs Lafferty, Moore and Reed was also impermissibly impaired in violation of the First and Fourteenth Amendments.

IV

Const 1963, art 2, § 4 vests the Legislature with the constitutional authority to enact election laws. Among its provisions is the so-called "purity of elections" clause:

"The legislature shall enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution or in the constitution and laws of the United States. *The legislature shall enact laws to preserve the purity of elections,* to preserve the secrecy of the ballot, to guard against abuses of the elective franchise, and to provide for a system of voter registration and absentee voting. No law shall be enacted which permits a candidate in any partisan primary or partisan election to have a ballot designation except when required for identification of candidates for the same office who have the same or similar surnames." (Emphasis added.)

Const 1963, art 1, § 2 is the Michigan equal protection clause. It provides, in pertinent part: *"No person shall be denied the equal protection of the laws * * *."*

Plaintiffs, through the adoption of the brief of amicus ACLU, argue the Legislature violated both in enacting 1976 PA 94.[20] We agree.

## A

The "purity of elections" clause has been interpreted by this Court to embody two separate concepts: first, that the constitutional authority to enact laws to preserve the purity of elections resides in the Legislature; and second, "that any law enacted by the Legislature which adversely affects the purity of elections is constitutionally infirm". *Wells v Kent County Board of Election Comm'rs,* 382 Mich 112, 123; 168 NW2d 222 (1969). The *Wells* Court further stated:

"The phrase, 'purity of elections,' is one of large dimensions. It has no single, precise meaning. The * * * cases demonstrate, however, that one of the primary goals of election procedures is to achieve equality of treatment for all candidates whose names appear upon the ballot." 382 Mich 123.

Plaintiffs argue that it is anomalous to require "equality of treatment for all candidates whose names appear upon the ballot" and not to limit the Legislature's ability to block access to the ballot. We agree with plaintiffs' analysis.

The "purity of elections" concept has been the *ratio decidendi* in a number of factually different

---

[20] Plaintiffs' brief to this Court does not discuss violations of Const 1963, art 1, §§ 1, 3 and 5 alleged in the complaint filed April 22, 1980. We, therefore, do not consider these alleged violations.

contexts. In *Wells v Kent County Board of Election Comm'rs, supra,* a statute which sanctioned ballot designation, as municipal or associate municipal judge, for elected incumbent municipal judges seeking election to the district court was ruled unconstitutional. This Court found that such a ballot designation gave the incumbent an unfair advantage over other candidates.

In *Elliott v Secretary of State,* 295 Mich 245; 294 NW 171 (1940), this Court held that it was the duty of election officials to rotate the names of candidates for Supreme Court Justice appearing on the non-partisan ballot for November 5, 1940. After noting that names which appear at the head of a list of candidates have "a distinct advantage", the Court stated:

"It is not consistent with fairness or purity of elections or the avoidance of misuse of elective franchise for election officials to prepare ballots in such a condition as will afford one candidate or nominee an unfair advantage over rival candidates or nominees. Hence we think the conclusion is justified that, even in the absence of specific constitutional or statutory provision, it is the clear duty of election officials, when reasonably possible, to prepare ballots in such a manner as will most effectively comply with the constitutional mandate touching the preservation of the purity of elections and guarding against abuse or misuse of the elective franchise." 295 Mich 249-250.

In *Arvan v Wayne County Clerk,* 381 Mich 761; 160 NW2d 345 (1968), this Court, by order dated July 10, 1968, affirmed a circuit court ruling that a statute permitting the names of incumbents to appear first on the ballot was unconstitutional. The order cited, as authority, *Elliott v Secretary of State, supra,* and "the purity of elections requirement" of Const 1963, art 2, § 4.

Although the "purity of elections" concept has been applied in different factual settings, it unmistakably requires, as plaintiffs correctly argue, fairness and evenhandedness in the election laws of this state. Moreover, it has been applied in both the general election ballot context, *Elliott v Secretary of State, supra,* and the primary election ballot context, *Wells v Kent County Board of Election Comm'rs.*

The instant case does not involve a litigant who alleges unfair treatment on the ballot by the Legislature but rather unfair treatment which has prevented access to the ballot. We take cognizance of this argument as an art 2, § 4, issue for two reasons. First, the phrase, "The legislature shall enact laws to preserve the purity of elections", does not limit the term "elections" to any specific times or actions. Nor would this be expected when the sentence immediately preceding this clause mandates the Legislature to enact laws to regulate the time, place and manner of nominations and elections. Clearly, the Legislature was meant to be given constitutional authority to enact laws governing the entire election process. Just as clearly, the election process includes access or failure to gain access to the ballot. Second, since we have required "equality for all candidates whose names appear upon the ballot", *Wells v Kent County Board of Election Comm'rs, supra,* it would be a hollow right if we were to allow unfair restrictions to deny placement on the ballot. The Legislature could then do indirectly what art 2, § 4, forbids it from doing directly.

The touchstone for plaintiffs' argument that 1976 PA 94 violates Const 1963, art 2, § 4, is whether the election procedure created affords an unfair advantage to one party or its candidates

over a rival party or its candidates. We conclude that it does.

1976 PA 94 requires primary election voters to vote for the candidates of one political party only or for one new political party. Perforce, candidates of parties entitled to automatic ballot placement have an unfair advantage over "new" political party candidates whose names do not appear on the primary election ballot. The primary election procedure, thus, discounts candidate and issue identification for "new" political parties and their candidates.

In addition, this procedure forces a "new" party to divert scarce resources and time from its political message to voter education campaigns solely designed to teach the electorate to associate its issues and the names of its candidates with the name of a political party for which voters must cast their ballots. By contrast, political parties entitled to automatic general election ballot placement, and their candidates, face no similar burdens. All energies and resources may be concentrated on candidate and issue identification.

In sum, we find that the primary election voting procedure of 1976 PA 94 imparts a substantial unfair advantage to political parties entitled to automatic general election ballot placement. Such parties, as distinguished from "new" political parties, need not expend valuable time and resources educating the electorate on how to cast an effective primary vote. The names of the candidates of such parties appear on the primary ballot and the candidates are free to devote all their energies to their respective political messages. We hold, therefore, the election procedure created by 1976 PA 94 is inconsistent with the goal of "equality of treatment" of parties and their candidates seeking

access to the general election ballot in violation of the "purity of elections" clause, Const 1963, art 2, § 4.

## B

Plaintiffs also argue 1976 PA 94 violates the Michigan equal protection clause, Const 1963, art 1, § 2. We agree and so hold, for the reasons stated in section III, *supra*.[21]

## V

Accelerated judgment for defendant Secretary of State reversed and the matter remanded to Wayne Circuit Court for proceedings in accordance with this opinion.

No costs, a public question being involved.

KAVANAGH, LEVIN, RYAN, and BLAIR MOODY, JR., JJ., concurred with FITZGERALD, J.

COLEMAN, C.J. *(dissenting)*. I respectfully dissent.

The majority opinion fails to address a focal and decisive point: the impact of the United States Supreme Court's summary affirmance in *Hudler v Austin, aff'd sub nom Allen v Austin,* 430 US 924; 97 S Ct 1541; 51 L Ed 2d 769 (1977), upon the ability of this Court to undertake an independent

---

[21] See *Governor v State Treasurer,* 390 Mich 389, 395; 212 NW2d 711 (1973), concurrence of T. G. KAVANAGH and LEVIN, JJ.

"In considering the Michigan constitutional question, we have been reminded of the frequent past expressions of this Court that the Michigan Constitution 'secures the same right of equal protection' as is secured by the Equal Protection Clause of the Fourteenth Amendment. *Fox v Employment Security Comm,* 379 Mich 579, 588; 153 NW2d 644 (1967); *Wolodzko v Wayne Circuit Judge,* 382 Mich 528, 534; 170 NW2d 9 (1969). We do not find it necessary here to determine the degree to which we follow the lead of the United States Supreme Court in analyzing an equal protection question asserted under our state Constitution."

examination of the merits of the present case and to arrive at a contrary conclusion on the federal constitutional question necessarily decided by *Allen.*

On the authority of *Hicks v Miranda,* 422 US 332; 95 S Ct 2281; 45 L Ed 2d 223 (1975) and *Mandel v Bradley,* 432 US 173; 97 S Ct 2238; 53 L Ed 2d 199 (1977), I would hold that *Allen* is precedent binding upon this Court, and thus forecloses this Court's review of the federal constitutional issue so extensively entertained by the majority.

I

An overview of the development of this seemingly esoteric area concerning the precedential value of summary dispositions by the United States Supreme Court is helpful to an understanding of the posture taken by this dissent. In the mid-1970's, the United States Supreme Court in several decisions adverted to the proposition that its summary affirmances or dismissals for want of a substantial federal question are to be accepted as decisions on the merits of the case and accordingly are to be given weight as precedent. See, *e.g., Edelman v Jordan,* 415 US 651; 94 S Ct 1347; 39 L Ed 2d 662 (1974); *Richardson v Ramirez,* 418 US 24; 94 S Ct 2655; 41 L Ed 2d 551 (1974).[1]

This is so, despite the fact that these types of summary actions are undertaken by the Supreme Court without its having afforded the case plenary consideration *(i.e.,* without conducting oral argument or obtaining exhaustive briefing of the perti-

---

[1] Earlier pronouncements on this subject exist, see, *e.g., Ohio ex rel Eaton v Price,* 360 US 246, 247; 79 S Ct 978; 3 L Ed 2d 1200 (1959).

nent issues).[2] The principle that summary actions are decisions on the merits and of precedential value was fully acknowledged in *Hicks, supra.* In *Hicks,* a three-judge federal district court refused to accord a prior United States Supreme Court summary dismissal for want of a substantial federal question status as controlling precedent. The United States Supreme Court chastised the lower court for ignoring its previous summary action, and in doing so, set forth some basic rules governing this area:

"A federal constitutional issue was properly presented [in the former case which was disposed of summarily], it was within our appellate jurisdiction under 28 USC 1257(2), and we had no discretion to refuse adjudication of the case on its merits as would have been true had the case been brought here under our certiorari jurisdiction. We were not obligated to grant the case plenary consideration, and we did not; but we were required to deal with its merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the California statute was not a substantial one. The three-judge court was not free to disregard this pronouncement. As Mr. Justice Brennan once observed, *'[v]otes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case * * *,'* Ohio ex rel Eaton v Price,* 360 US 246, 247 (1959); *cf.* R. Stern & E. Gressman, Su-

---

[2] The absence of plenary consideration has been stated as a reason why the Supreme Court need not accord full precedential weight to its own summary dispositions, see Justice Brennan's dissent to the denial of certiorari in *Colorado Springs Amusements, Ltd v Rizzo,* 428 US 913, 916-917; 96 S Ct 3228; 49 L Ed 2d 1222 (1976). However, "[t]his description of disposition after cursory discussion is difficult to reconcile with the theory that each summary affirmance or dismissal for insubstantiality is a decision on the merits worthy of the deference of all lower courts." *The Precedential Effect of Summary Affirmances and Dismissals for Want of a Substantial Federal Question by the Supreme Court After Hicks v Miranda and Mandel v Bradley,* 64 Va L Rev 117, 127 (1978) (hereinafter cited as *Precedential Effect).*

preme Court Practice 197 (4th ed, 1969) ('The Court is, however, deciding a case on the merits, when it dismisses for want of a *substantial* question * * *'); C. Wright, Law of Federal Courts 495 (2d ed, 1970) ('Summary disposition of an appeal, however, either by affirmance or by dismissal for want of a substantial federal question, is a disposition on the merits'). The District Court should have followed the Second Circuit's advice, first, in *Port Authority Bondholders Protective Committee v Port of New York Authority,* 387 F2d 259, 263, fn 3 (1967), that 'unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise'; and, later, in *Doe v Hodgson,* 478 F2d 537, 539, *cert den sub nom Doe v Brennan,* 414 US 1096 (1973), that *the lower courts are bound by summary decisions by this Court* ' "*until such time as the Court informs [them] that [they] are not.*" ' " *Hicks, supra,* 344-345. (Emphasis added.)

While some criticism has been levelled at *Hicks* for not providing the lower courts with guidance with regard to their application of summary dispositions as precedent,[3] footnote 14 of Justice White's opinion in *Hicks* is instructive: the issues in the case treated summarily by the United States Supreme Court must be "sufficiently the same" as the issues presented in the case before the lower court, and the lower court is obliged "to ascertain what issues had been properly presented in [the case summarily affirmed or dismissed] and declared by this Court to be without substance". *Hicks, supra,* 345, fn 14.

*Mandel, supra,* further refines what was said by the *Hicks* Court and exists as an important state-

---

[3] *Precedential Effect, supra,* 122.

ment on how lower courts are to apply *Hicks.*[4]
*Mandel* is notable on several counts: it not only
reaffirms *Hicks,* but also provides explicit commentary of its own which is particularly significant to
the instant case:

"Summary affirmances and dismissals for want of a
substantial federal question without doubt reject the
specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed
from. They do prevent lower courts from coming to
opposite conclusions on the precise issues presented and
necessarily decided by those actions." *Mandel, supra,*
176.

Further, *Mandel* instructs that in evaluating the
precedential import of a summary action, other
courts must conscientiously examine the facts of
the case before them and compare them to the
facts of the case affirmed or dismissed in summary
fashion by the United States Supreme Court.

Some judicial speculation has arisen that *Mandel* disavowed *Hicks,* and that more recent developments, *viz., Illinois State Board of Elections v
Socialist Workers Party,* 440 US 173; 99 S Ct 983;
59 L Ed 2d 230 (1979), have eroded the utility of
*Hicks,* see, *e.g., Lecates v Justice of Peace Court
No 4,* 637 F2d 898, 902-903 (CA 3, 1980).[5]

---

[4] In *Mandel,* a three-judge federal district court faced with the
question of the constitutionality of early filing deadlines for independent candidates in Maryland relied on the Supreme Court's summary
affirmance in a case which had dealt with a similar Pennsylvania
statute, and declined to reach the merits of the case. The Supreme
Court remanded to the district court for consideration of the merits,
largely because the facts of the Pennsylvania case were radically
different from those presented in *Mandel;* moreover, critical dissimilarities between the pertinent election statutes worked to prevent the
lower court from regarding the Pennsylvania case as controlling
precedent.

[5] Justice Marshall, writing for the Court in *Illinois State Board,
supra,* 180-181, stated:

"Appellant argues here, as it did below, that this Court's summary

To the contrary, *Hicks* continues to be good law, and *Illinois Board of Elections* does not operate to give this Court latitude to reconsider fully the federal constitutional issue before us. Significantly, the Supreme Court itself has continued to cite *Hicks* authoritatively, see, *e.g., Metromedia, Inc v San Diego,* 453 US 490, 499; 101 S Ct 2882; 69 L Ed 2d 800 (1981); see, also, Justice White's concurrence in a dismissal for want of a substantial federal question in *McKeesport Area School Dist v Pennsylvania Dep't of Education,* 446 US 970, 971; 100 S Ct 2953; 64 L Ed 2d 831 (1980); *Rome v United States,* 446 US 156, 212, fn 4; 100 S Ct 1548; 64 L Ed 2d 119 (1980) (Rehnquist, J., *dissenting).*

Additionally, the argument that *Illinois State Board* confers upon lower courts unfettered discretion to discard what the Supreme Court has dictated through its summary affirmances and dismissals rests upon a misunderstanding of what the Supreme Court means when it says that its summary dispositions do not carry the same weight as do full opinions issued after plenary consideration. Quite simply, the Supreme Court says that *it* need not accord full precedential value to its own summary actions, *not* that lower courts are free to do the same.

In so stating, the Supreme Court merely recog-

affirmance of *Jackson v Ogilvie, supra* [325 F Supp 864 (ND Ill, 1971), *aff'd* 403 US 925 (1971)], is dispositive of the equal protection challenge here. In analyzing this contention, we note at the outset that summary affirmances have considerably less precedential value than an opinion on the merits. See *Edelman v Jordan,* 415 US 651, 671 [94 S Ct 1347; 39 L Ed 2d 662] (1974). As Mr. Chief Justice Burger observed in *Fusari v Steinberg,* 419 US 379, 392 [95 S Ct 533; 42 L Ed 2d 521] (1975) (concurring opinion), 'upon fuller consideration of an issue under plenary review, the Court has not hesitated to discard a rule which a line of summary affirmances may appear to have established.' See *Usery v Turner Elkhorn Mining Co,* 428 US 1, 14 [96 S Ct 2882; 49 L Ed 2d 752] (1976)."

nizes its place in the judicial hierarchy. This interpretation is fully substantiated by the Supreme Court's own statements. For example, in *Illinois State Board,* the case relied upon so heavily by the majority in its assessment of the constitutionality of 1976 PA 94, the Court's pronouncement that "summary affirmances have considerably less precedential value than an opinion on the merits" is immediately followed by a statement indicating that "the Court" itself has not been constrained to follow a rule which may appear to have been established by summary affirmances.[6]

Another example of the Supreme Court's intent to confine the "less-than-full-precedent" rule to its own bench is contained in a footnote in *Washington v Confederated Bands and Tribes of the Yakima Indian Nation,* 439 US 463, 476-477, fn 20; 99 S Ct 740; 58 L Ed 2d 740 (1979): "They [summary dismissals] do not, however, have the same precedential value *here* as does an opinion of this Court after briefing and oral argument on the merits." (Emphasis supplied.) Finally, in *Metromedia, supra,* p 500, the Court acknowledged the propriety of the California Supreme Court's reliance on one of its summary decisions, but added (I might point out, with citation to *Illinois State Board)* that "summary actions do not have the same authority *in this Court* as do decisions rendered after plenary consideration". (Emphasis supplied.) See, also, Stern & Gressman, Supreme Court Practice (5th ed, 1978), p 330; 12 Moore's Federal Practice (2d ed), ¶ 400.05-1.

---

[6] Cases in which the Supreme Court has decided not to follow a line of past summary actions include: *Massachusetts Board of Retirement v Murgia,* 427 US 307; 96 S Ct 2562; 49 L Ed 2d 520 (1976); *Usery v Turner Elkhorn Mining Co,* 428 US 1; 96 S Ct 2882; 49 L Ed 2d 752 (1976).

II

To recapitulate briefly the foregoing, summary affirmances or dismissals by the United States Supreme Court are decisions on the merits which are binding on other courts as precedent. The Supreme Court itself is not required to adhere strictly to that which seems to be established by one or many of its summary actions. However, lower state and federal courts are not given the same leeway. If the lower court is confronted with "precise issues presented and necessarily decided" by a United States Supreme Court summary disposition, it must treat the summary action as binding precedent. A primary task, then, for another court considering the effect of a Supreme Court summary disposition is to determine the reach of that disposition.

In the instant case, this Court is obliged to ascertain whether the Supreme Court "necessarily decided" by summarily affirming in *Allen, supra,* the "precise issue" before us here. I conclude that it did and therefore, that the majority errs in proceeding to decide the federal constitutional issue in a manner contrary to that which is dictated by *Allen.*

In *Hudler v Austin,* 419 F Supp 1002 (ED Mich, 1976), a three-judge district court (one judge dissenting) considered plaintiffs' challenge to 1976 PA 94 on First and Fourteenth Amendment (association and franchise) and equal protection grounds and concluded that the statute did not abridge these federal constitutional rights. However, the court did award plaintiffs limited relief by allowing them ballot access for the then-imminent November, 1976 election. Plaintiffs directly appealed

this judgment to the United States Supreme Court. The jurisdictional statement[7] supplied by plaintiffs delineated a single issue for consideration on appeal:

"Whether the Michigan Election Code, on its face and as applied, invidiously discriminates among political parties in violation of the equal protection clause of the Fourteenth Amendment and unnecessarily burdens political activity in violation of the First Amendment, by requiring new political parties who have qualified for the general election ballot by submitting the required number of petitions, to further qualify for the general election ballot by additionally receiving 0.3% of the votes cast at the primary election." 9085 Records and Briefs of the United States Supreme Court, No 76-1038, p 8.

The jurisdictional statement appears to state accurately the constitutional issue treated by the district court in *Hudler.* Rule 15.1(a) of the Supreme Court Rules specifies that "[o]nly the questions set forth in the jurisdictional statement or fairly included therein will be considered by the Court." It is therefore eminently clear that, in affirming *Hudler,* the Supreme Court necessarily considered the sole issue before it—the constitutionality of 1976 PA 94—and necessarily decided that the lower court's judgment with respect to that issue was correct.

## III

The case at bar involves the identical statute and substantially the same parties as were before

[7] Required by Supreme Court Rule 12. See Supreme Court Rule 15.1 for a listing of the material to be included in a jurisdictional statement.

the United States Supreme Court in *Allen.* The federal constitutional issue "necessarily decided" by the summary affirmance in *Allen* is identical to that addressed by the majority here.

Appellants contend that a new constitutional issue—an "as applied" attack—is being raised here. This appears to mean that appellants claim the procedures used to implement 1976 PA 94 in a given election year were "unconstitutional in their impact upon the legislative scheme", *Dean v Austin,* 602 F2d 121, 123 (CA 6, 1979). However, the majority opinion is decidedly a "facial" analysis, and indeed, because of the procedural posture of this case, there is no evidence before the Court on just how 1976 PA 94 might be found unconstitutional "as applied".

Moreover, I note that the jurisdictional statement in *Allen* challenged the statute on both "facial" and "as applied" grounds.

IV

Therefore, I would affirm the trial court's judgment with regard to the question of the constitutionality of 1976 PA 94 under the provisions of the United States Constitution, although for a different reason. Because the trial court has not been given the opportunity to develop a record on the question of how this legislation might abridge various provisions of the Michigan Constitution, I would remand the remaining issues to the trial court for its consideration.

WILLIAMS, J., concurred with COLEMAN, C.J.