Marion BARRY, Jr., et al., Appellants,

v.

Nate BUSH, et al., Appellees,

Parents United for the District of Columbia Schools, Glenda Partee and Lorraine Wilson, Intervenors–Appellees.

Nos. 90–1047, 90–1048.

District of Columbia Court of Appeals.

Argued Sept. 12, 1990.

Decided Sept. 25, 1990.

James C. McKay, Jr., Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the briefs, for appellants.

Cecelia E. Wirtz, with whom Richard Albright and Paula R. Perelman, Washington, D.C., were on the brief, for appellees.

Wayne H. Matelski, with whom Joanne Ochsman, Roderic V.O. Boggs, Mary M. Levy, and Avis Buchanan, Washington,

*District of Columbia Zoning Comm'n,* 431 A.2d    560, 565 (D.C.1981).

D.C., were on the brief, for intervenors-appellees, Parents United for the District of Columbia Schools, Glenda Partee and Lorraine Wilson.

Before FERREN, STEADMAN, and SCHWELB, Associate Judges.

FERREN, Associate Judge:

This case presents the question whether the Mayor has the authority unilaterally to reduce the Board of Education's 1990 fiscal year appropriation. We hold that he does not.

### I. The Facts and Proceedings

The facts of this case are not in dispute. The District of Columbia is running out of money before the end of its 1990 fiscal year. In an attempt to prevent an even more severe revenue shortfall, the Mayor took several actions. Initially, he and the Council forwarded to Congress, on April 13, 1990, a supplemental budget request act asking for a reduction of the amount which the District was authorized to spend.[1] Congress approved. See *supra* note 1. That reduction included approximately 1% of the previously approved Board of Education's budget.[2] The reduction did not eliminate the accumulating shortfall.[3] On June 26, 1990, the Mayor attempted to cut more funds from the Dis-

trict's budget by proposing the "Fiscal Year 1990 Second Supplemental Budget and Rescissions Of Authority Request Act of 1990," Bill 8–623. The Council defeated the Mayor's proposal,[4] and the bill was not sent to Congress.

As a final effort to prevent the District from exceeding its budget, the Mayor issued Order 90–103[5] on July 19, 1990, mandating an overall reduction of an average of 2% from all District departments and agencies except the Metropolitan Police Department.[6] This Order is the subject of the current dispute. It commands the Board of Education to cut $10,861,000 from the supplemental appropriation for fiscal year 1990, see *supra* note 2, leaving a total Board budget of $486,285,000.[7]

On July 26, 1990, the members of the Board filed a complaint against the Mayor and the District of Columbia and moved for a temporary restraining order and a preliminary injunction to prevent implementation of the $10,861,000 cut. The next day, Judge Shuker granted the requested temporary restraining order, ruling that the Mayor lacked authority unilaterally to reduce the Board's budget and, further, that the Mayor's actions violated a prior, court-approved settlement agreement.

On August 1, 1990, the Corporation Counsel, acting on behalf of the Mayor and

---

1. Fiscal Year 1990 Supplemental Budget and Rescissions of Authority Request Act of 1990, D.C. Act 8–189, 37 D.C. Reg. 2608 (eff. April 13, 1990), Dire Emergency Supplemental Appropriations for Disaster Assistance, Food Stamps, Unemployment Compensation Administration, and Other Urgent Needs, and Transfers, and Reducing Funds Budgeted for Military Spending Act of 1990, Pub.L. 101–302, 104 Stat. 213, 240–43 (1990). (The District noted that this Act reduced total District appropriations by $25,446,-000.)

2. The District's fiscal year 1990 budget was approved in November 1989, D.C. Appropriations Act, 1990, Pub.L. 101–168, 103 Stat. 1267 (1989). It allocated $502,346,000 to the Board of Education. *Id.* at 1271. The supplemental budget which the Mayor and Council approved and Congress enacted supplemented the Board of Education's budget by $2,682,000 and rescinded $7,882,000, resulting in a new budget of $497,-146,000. 104 Stat. 213, 241 (1990).

3. The District estimated that, even after the reduction, the revenue shortfall would exceed $55 million.

4. Memorandum Decision and Order, D.C.Super. Ct., August 10, 1990, at 2 (Judge Salzman took judicial notice of the minutes of the Council's June 26, 1990 meeting where the Mayor's second proposed supplemental budget was defeated).

5. 37 D.C.Reg. 4932 (eff. July 19, 1990).

6. The Mayor takes the position that "Section 103 of the D.C. Appropriation Act, 1990, 103 Stat. 1275 (1989), precludes the Mayor from reducing the expenditure level of the Metropolitan Police Department, but not that of any other agency, below the level established by Congress." District's Brief at 2 n. 5.

7. This amount is a reduction of approximately 2.1% of the supplemental Board appropriation of $497,146,000 for fiscal year 1990. See *supra* note 2.

the District (hereinafter collectively called the District) filed a motion for a temporary restraining order in an effort to prevent the Board from obligating the disputed amount before the preliminary injunction hearing. The next day Judge Shuker denied the District's motion, noting that the Mayor, not the Board, was attempting to alter the status quo. On the same day, the District filed an emergency motion in this court requesting a stay of Judge Shuker's order of July 27, 1990. Before we ruled on the emergency motion, Judge Salzman held a hearing, on August 6, 1990, to consider the Board's motion for preliminary injunction. He combined that hearing with a hearing on the District's emergency motion and a trial on the merits. At that hearing, an organization known as Parents United for the District of Columbia Schools was allowed to intervene.[8] On August 10, 1990, the District filed with Judge Salzman another motion, requesting reconsideration of Judge Shuker's denial of the District's motion for a temporary restraining order.

Later that day, Judge Salzman issued his decision in favor of the Board, ruling that the Mayor's actions were "null and void." Judge Salzman based his decision on two grounds: (1) the Mayor lacked power unilaterally to reduce the Board's budget, and (2) in applying Order 90–103 to the Board, the Mayor violated the Settlement Stipulation signed five years after the trial court's decision in *Evans v. Washington*, 106 Daily Wash.L.Rptr. 1929 (D.C.Super.Ct. Sept. 7, 1978) (Belson, J.).[9]

On August 16, 1990, Judge Salzman entered a permanent injunction ordering the Mayor not to reduce the Board's budget.

That same day the District filed a docketing statement and two procedural motions, and, on August 17, 1990, the District filed the instant appeal. On August 27, 1990, a motions division of this court granted the District's request for a stay of Judge Salzman's order pending resolution of the District's appeal.

## II. The Post-*Evans* Settlement Stipulation

■ We begin by noting that both the Board and the District agree that Order 90–103, as applied to the Board, clearly and unequivocally violates the unambiguous terms of the post-*Evans* Settlement Stipulation:

> Defendants [the District] hereby stipulate that neither the Mayor nor his subordinates will unilaterally reduce—whether by apportionment, reapportionment, allocation, encumbrance, prohibition, freezing, or change in accounting, budget, procurement, or financial procedures— the authorized spending level or preclude the expenditure of monies duly appropriated by Congress to the Board of Education and to the District of Columbia Public Schools in any given fiscal year; provided, however, that the Board of Education recognizes the authority of the Mayor to submit a supplemental or deficiency budget, pursuant to Section 442(c) of the District of Columbia Self–Government and Government Reorganization Act (P.L. 93–168), to the Council of the District of Columbia and, upon the latter's approval, to the Congress of the United States, to authorize a rescission of budget authority theretofore granted

---

8. Parents United is a local group composed of parents of students in the District's public schools.

9. At issue in *Evans* was Mayor Washington's Order 75–124, which placed a hiring freeze on the Board of Education and severely limited the Board's authority to obligate funds. The Order prohibited the disbursement of funds for several purposes, *e.g.*, purchase of supplies, equipment, and materials, and further required that the Board make no obligation unless the Director of the Office of Budget and Management Systems

approved the expenditure. *Evans*, 106 Daily Wash.L.Rptr. at 1933. Judge Belson's 1978 decision granted summary judgment in the form of declaratory relief for the Board. The complaint in that case also had sought injunctive relief, which Judge Belson postponed in the hope that the parties would settle. Five years later, on September 26, 1983, after Mayor Barry succeeded Mayor Washington, the parties agreed to settle their dispute and entered into a Settlement Stipulation that Judge Mitchell signed the same day. This settlement is the basis for Judge Salzman's opinion.

to the D.C. Public Schools.[10]

Judge Mitchell signed the Stipulation and explicitly retained "continuing jurisdiction to enforce, if necessary, the terms of this Settlement Stipulation." As Judge Salzman properly held, the Mayor violated the express terms of a judicially supervised settlement agreement that was the result of "full and complete litigation." [11] Thus, the Mayor's only proper course in this matter was to return to Superior Court, before implementation of Order 90–103, to seek judicial permission to modify the decree in light of the legal position the Mayor now advances in defending his unilateral action. *See Local No. 93, Int'l. Assoc. of Firefighters v. Cleveland,* 478 U.S. 501, 515–24, 106 S.Ct. 3063, 3071–76, 92 L.Ed.2d 405 (1986); *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985); *see also D.D. v. M.T.,* 550 A.2d 37, 44 (D.C.1988) (party that fails to seek modification of court's mandate acts at his or her own peril).

■ The District argues that statutory changes (see *infra* Part III.) which occurred after the Mayor signed the post-*Evans* Settlement Stipulation have made the Mayor's continued adherence to that Stipulation a violation of his statutory duty to balance the District's budget.[12] Even if the District were correct—that subsequent statutory changes have affected the legali-

ty of the Stipulation—we have found no precedent for the District's proposition that parties to a court-endorsed settlement agreement are entitled, if they perceive a relevant change in the law, simply to ignore their signed commitments.[13] In fact, at least one case the District cites suggests that, with a subsequent change in the law or the facts, courts will modify such decrees if it is equitable to do so. *See, e.g., New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956, 970 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983). The decisions which the District cites, *see id.* and *supra* note 13, should have convinced the Mayor to return to the trial court before applying Order 90–103 to the School Board.

The District's position—that it can rely on subsequent changes in the law as the basis for ignoring a settlement agreement—is untenable because it would allow a party arbitrarily to opt out of an agreement with any perceived statutory change and thus would weaken the incentive to settle disputes. *See Berger,* 771 F.2d at 1568 ("A defendant who has obtained the benefits of a consent decree—not the least of which is the termination of litigation—cannot then be permitted to ignore such affirmative obligations as were imposed by the decree.")

10. A copy of the Settlement Stipulation is appended to the Opposition of Parents United to Defendant's Emergency Motion, filed in this court on August 2, 1990.

11. See Memorandum Decision and Order, *supra* note 4, at 13.

12. The District also argues that the Settlement Stipulation precludes the Mayor from exercising his statutory responsibilities under the Self–Government Act, and that the Stipulation, accordingly, was invalid at its inception. As the present case indicates, the question of the Mayor's claimed authority over the Board's budget was far from clear. It appears to have been in everyone's interest to enter into the Stipulation. The District cites no authority, and we have found none, which would authorize a governmental party that enters into an intended binding agreement under such circumstances to ignore its obligations without first seeking a judicial ruling.

13. In its brief, and again at oral argument, the District relied on *Firefighters Local Union No. 1784 v. Stotts,* 467 U.S. 561, 104 S.Ct. 2576, 81

L.Ed.2d 483 (1984) and *System Federation No. 91, Railway Empl. Dep't v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961). Neither supports the District's position. *Stotts* did not reach the issue and mentions, in a footnote responding to the dissent, that subsequent statutory changes which contradict consent decrees call for judicial modification of the decree. *Stotts,* 467 U.S. at 576 n. 9, 104 S.Ct. at 2586 n. 9. *Wright,* moreover, is directly on point against the District. In *Wright,* nonunion railway employees obtained a consent decree that prevented the railroad from discriminating against the employees because they were nonunion. The law was amended after the consent decree to allow contracts to require union shops. The unions returned to court and filed a motion to modify the consent decree. 364 U.S. at 644–45, 81 S.Ct. at 369–70. Properly read, therefore, both *Stotts* and *Wright* require a judicial modification of judicially supervised agreements before a party can rightfully claim not to be bound by the terms of such an agreement.

In this case, however, the District's failure to seek judicial modification of the Settlement Stipulation did not go unnoticed— the Board sued—and Judge Salzman ruled on the merits of the District's legal position. For us to remand the case to reopen the settlement, therefore, before ruling on the merits of the applicable statutes, would be a waste of precious time [14] and judicial resources at this point. In the event we were to agree with the Board's position on the merits, the terms of the settlement—as applied to this case—would remain in effect as a matter of law, not merely as a matter of stipulation; no further trial court consideration would be required. Only if we were to conclude that the Mayor does have the claimed unilateral authority to reduce the Board's budget would there be a

**14.** We note the urgency of the present appeal. The District represented at oral argument that if the issue is not decided by September 30, 1990, the end of fiscal year 1990, the amounts in dispute would automatically be applied to reduce the deficit. The Board argues that its fiscal responsibilities demand its access to the remainder of its budget by September 25, 1990, in order to disburse the funds properly.

**15.** For example, counsel for Parents United represented at oral argument that if the Mayor had refused to settle the *Evans* injunction issue, or if the Mayor had returned to the court to attempt to modify the agreement, Parents United would have proposed a citizen's initiative to restrict the Mayor's authority to reduce the Board's budget unilaterally. For this reason, Parents United claims reliance on the Settlement Stipulation in a way that equitably forecloses abrogation of that Stipulation.

**16.** The relevant language from D.C.Code §§ 47-301, -310, -312(2), and -313(c) and (d) (1990) is:
§ 47-301(a): At such time as the Council may direct, the Mayor shall prepare and submit to the Council each year, and make available to the public, an annual budget for the District of Columbia government which shall include:
(1) The budget for the forthcoming fiscal year in such detail as the Mayor determines necessary to reflect the actual financial condition of the District government for such fiscal year, and specify the agencies and purposes for which funds are being requested; and which shall be prepared on the assumption that proposed expenditures resulting from financial transactions undertaken on either an obligation or cash outlay basis, for such fiscal year shall not exceed estimated resources from existing sources and proposed resources;
§ 47-310(a)(1): [The Mayor shall] [s]upervise and be responsible for all financial transactions to insure adequate control of revenues

role for the trial court to consider whether equitable considerations, in light of the Settlement Stipulation, might constrain the Mayor's use of that authority in this case.[15] We therefore turn to the merits.

### III. Mayor's Authority to Cut the Board of Education's Budget

The District asserts that the Mayor's use of Order 90-103 unilaterally to reduce the Board's budget was justified on several statutory grounds. Specifically, the District urges that [1] §§ 442(a)(1), 448, 449(b), 603(c) and (d) of the Self-Government (or Home Rule) Act, D.C.Code §§ 47-301, -310, -312(2), -313(c) and (d) (1990),[16] [2] applicable provisions of the federal Anti-Deficiency Act, 31 U.S.C. §§ 1341 *et seq.* (1988),[17]

and resources and to insure that appropriations are not exceeded;
§ 47-310(a)(9): [The Mayor shall] [a]pportion the total of all appropriations and funds made available during the fiscal year for obligation so as to prevent obligation or expenditure thereof in a manner which would indicate a necessity for deficiency or supplemental appropriations for such fiscal year....
§ 47-312(2): [The Mayor shall] [e]xamine and approve all contracts, orders, and other documents by which the District government incurs financial obligations, having previously ascertained that money has been appropriated and allotted and will be available when the obligations shall become due and payable;
§ 47-313(c): The Council shall not approve any budget which would result in expenditures being made by the District government, during any fiscal year, in excess of all resources which the Mayor estimates will be available from all funds available to the District for such fiscal year. The budget shall identify any tax increases which shall be required in order to balance the budget as submitted. The Council shall be required to adopt such tax increases to the extent its budget is approved.
§ 47-313(d): The Mayor shall not forward to the President for submission to Congress a budget which is not balanced according to the provision of subsection (c) of this section.

**17.** D.C.Code § 47-313(e) (1990) mandates that the District comply with the federal Anti-Deficiency Act. The pertinent language of that Act, 31 U.S.C. § 1341(a)(1)(A) (1988), is:
(a)(1) An officer or employee of the United States Government or of the District of Columbia may not—
(A) make or authorize an expenditure or obligation exceeding an amount available in

and [3] the D.C. Appropriations Act, 1990, Pub.L. 101–168, 103 Stat. 1267, 1272, 1275 (1989),[18] impose a duty on the Mayor to ensure that the District remains financially sound during the fiscal year.

■ These statutory provisions do impose on the Mayor responsibility, as comptroller, for administering the District's budget during the fiscal year. Moreover, we have held that some of these provisions, coupled with others including a statute not relevant here, D.C.Code § 37–106 (1990), authorized the Mayor unilaterally to reduce the Public Library's appropriation. *Hazel v. Barry*, 580 A.2d 110, 112–113 (D.C.1990). But as *Hazel* itself recognizes, *see* p. 114 n. 11, these statutes do not necessarily confer authority on the Mayor to reduce the Board of Education's appropriations. As the Board and amicus point out—and as the trial court ruled—another statutory provision found in the Self–Government Act, § 452, D.C.Code § 31–104 (1988), limits the Mayor's power over the Board's appropriations to acting jointly with the Council.

> Section 31–104, in relevant part, states: With respect to the annual budget for the Board of Education in the District of Columbia, *the Mayor and the Council may establish the maximum amount of funds which will be allocated to the Board,* but may not specify the purposes for which such funds may be expended or the amounts of such funds which may be expended for the various programs under the jurisdiction of the Board of Education.

an appropriation or fund for the expenditure or obligation....

**18.** The relevant sections of the D.C. Appropriations Act, 1990, Pub.L. 101–168, 103 Stat. 1267, 1272, 1275 (1989), state:

For the purpose of reducing the $218,872,-000 general fund accumulated deficit as of September 30, 1988, $20,000,000, of which not less than $442,000 shall be funded and apportioned by the Mayor from amounts otherwise available to the District of Columbia government (including amounts appropriated by the Act or revenues otherwise available, or both):

...

\* \* \* \* \* \*

Sec. 103. Whenever in this Act an amount is specified within an appropriation for partic-

*Id.* (emphasis added). The Board argues that this statutory limitation "reflects the historical position of the Board as an elected body," and that allowing the Mayor the power to reduce—unilaterally—the Board's appropriations would intrude on the Board's established autonomy by violating express statutory limits. We agree.

■ Specifically, § 31–104 provides that the "Mayor and the Council may establish the maximum amount of funds which will be allocated to the Board." *Id.* The language is unambiguous: establishment of the Board's maximum budget must include participation of both the Mayor and the Council. In this case, however, the Mayor is attempting unilaterally to establish a new maximum, but nevertheless a maximum, which the Board can spend. His actions are in direct violation of the statute.

■ We find no merit in the District's argument that § 31–104 applies only to formulation of the budget, before appropriation. First, no such limit is present in the express wording of the statute, which must be our first guide for statutory interpretation. *See Peoples Drug Stores, Inc. v. District of Columbia*, 470 A.2d 751, 753 (D.C.1983) (en banc). Second, even if the District is correct in contending that the Mayor's and Council's joint responsibility under § 31–104 is limited to budget formulation, we do not understand why the Mayor's unilateral action under Order 90–103 is not a "formulation," though not the initial formulation, of the Board's budget. Changing the budget of the Board, wheth-

ular purposes or objects of expenditure, such amount, unless otherwise specified, shall be considered as the maximum amount that may be expended for said purpose or object rather than an amount set apart exclusively therefor, except for those funds and programs for the Metropolitan Police Department under the heading "Public Safety and Justice" which shall be considered as the amounts set apart exclusively for and shall be expended solely by that Department; and the appropriation under the heading "Repayment of General Fund Deficit" which shall be considered as the amount set apart exclusively for and shall be expended solely for that purpose.

er initially or through a process of amendment during the fiscal year, involves "establish[ing] the maximum amount of funds which will be allocated to the Board," precisely what § 31–104 requires the Mayor and Council to do together.[19] According to this statute, therefore, the Mayor cannot unilaterally reset the maximum amount of funds available to the Board of Education. *See Evans v. Washington,* 106 Daily Wash. L.Rptr. 1929, 1937 (D.C.Super.Ct. Sept. 7, 1978) (Belson, J.) ("However, once the Mayor and the Council have set the maximum amount of funds to be allocated to the Board [of Education] within the overall District government budget, and Congress has authorized appropriations, the Mayor's *sole* remaining responsibility is to provide the means by which expenditures are made.") (Emphasis added.)

█ The District argues that the legislative history of § 31–104 limits the Board's budgetary autonomy to determining the manner in which appropriated funds are allocated, and does not insulate the Board against a revised appropriation ordered by the Mayor. We note, initially, that legislative history is seldom relevant unless the statutory language is ambiguous. *Varela v. Hi–Lo Powered Stirrups, Inc.,* 424 A.2d 61, 64 (D.C.1980) (en banc). There is no ambiguity in this case. But even if we do consider the legislative history, *see Peoples,* 470 A.2d at 754, as the District invites, the District's conclusion does not follow. All the history the District cites stresses the respective roles of the Mayor and the Council, acting together, in the budgetary process.[20] If anything, the history supports the Board's reading of

§ 31–104 that the Mayor and Council, not the Mayor alone, must act to recommend reduction of the Board's appropriation.

Also unavailing is the District's contention that the D.C. Appropriations Act, 1990, see *supra* note 18, implicitly overrides § 31–104 and empowers the Mayor to reduce the Board's appropriations. We recognize that this congressional act refers to funding and apportionment of debt reduction "by the Mayor" and expressly provides that each appropriation is but a "maximum amount" (with two exceptions not relevant here). See *supra* note 18. But unlike the Mayor's unilateral budgetary authority over the Public Library, *see Hazel,* slip op. at 9, 10 & n. 11, the Mayor's budgetary authority over the Board of Education is limited to concurrent action with the Council—a limitation Congress did not explicitly override in the 1990 Appropriations Act. Absent language in the 1990 Act that would change that concurrent authority, we cannot properly assume that the specific budgetary procedure outlined in the Self–Government Act, § 452, D.C.Code § 31–104 (1988)—that the Mayor and Council together set the maximum Board budget—has been repealed by implication. *See United States v. Young,* 376 A.2d 809, 813 (D.C.1977); *Goodwin v. District of Columbia Bd. of Ed.,* 343 A.2d 63, 65–66 (D.C. 1975).

The District argues, finally, that our rejection of its argument leaves the Board of Education immune from budget cuts. That is not the case. The Board is insulated only from budget cuts which the Mayor initiates unilaterally. Pursuant to

---

**19.** Recall that the Mayor and Council together proposed the first deficiency recommendation that Congress adopted for fiscal year 1990. See *supra* note 2. The fact that the Council rejected the Mayor's proposal for a second deficiency recommendation is apparently the central reason why the Mayor has sought to accomplish the same end unilaterally.

**20.** *See* S.Rep. No. 219, 93d Cong., 1st Sess. 8 (1973) ("[S]ince the *Council* has overall responsibility for raising the general funds of the District it should have the responsibility for determining the general allocation of resources to meet the various needs of the District.") (emphasis added); *Home Rule: Hearings on H.R. 12823,*

*H.R. 355, H.R. 9881, H.R. 12922, H.R. 8579, H.R. 12973, H.R. 9197, H.R. 9599, H.R. 6141, H.R. 9499, H.R. 10196–97–98, H.R. 10386, H.R. 13033, S. 2652 and H.R. 12543 Before the House Comm. on the District of Columbia,* 92d Cong., 2d Sess. 166 (1972) ("The District Government would be given complete authority to set the budget. (Title V.) The *Mayor and the City Council* would be limited with respect to the budget of the Board of Education, however. The *District Government* would only be free to set the maximum level of Board of Educations expenditures. . . .") (emphasis added) (statement of the Hon. Walter E. Fauntroy).

§ 31–104, the Board's budget is subject to reduction—as indeed it was, two months earlier—whenever the Mayor and the Council can agree that such cuts are appropriate and Congress approves. *See also* D.C.Code § 47–301(c) (1990); *Convention Center Referendum Comm. v. District of Columbia Bd. of Elections and Ethics*, 441 A.2d 889, 906 n. 31 (D.C.1981) (en banc) (plurality opinion). But § 31–104 makes clear that the elected Board of Education retains fiscal insulation against the Mayor's unilateral interference. As *Hazel* noted in specifically excluding the Board of Education from the ruling: the language of the Self–Government Act "explicitly vests certain powers in the Board of Education and restricts the Mayor's budgetary authority over the Board." *Hazel*, at 114 n. 11.[21] In fact, this court carefully limited *Hazel* to the Public Library and expressly left open the possibility that a case, such as this one, could come out differently: "we emphasize that our holding applies only to the Public Library; it does not necessarily extend to funding disputes involving other agencies, entities, or branches of the District of Columbia government." *Id.* at 110–111.

We do not ignore the fact that the Mayor has a duty under the Self–Government Act to take action to keep the District's budget in balance. *See id.* at 112. What is at issue in this case, however, is the Mayor's attempt to fulfill this duty by unilaterally calling for reduction of appropriations for the Board of Education. The Self–Government Act itself, § 452, D.C.Code § 31–104 (1988), expressly provides that the Mayor may not do so alone.

The judgment of the Superior Court is therefore

*Affirmed.*

---

**21.** This interpretation of § 31–104 is buttressed by other statutory provisions highlighting the unique status of the Board of Education. For example, D.C.Code § 31–2216 (1988), provides: [F]unding of the public schools [is] acknowledged as of the highest priority by the District of Columbia. This priority status for public education funding will be given due consideration by the District of Columbia Board of Education, the Council of the District of Columbia and the Mayor of the District of Columbia in all future proposals, recommendations, and legislative enactments affecting financial support of the public schools.