DETROIT CITY COUNCIL v MAYOR OF DETROIT

Docket No. 98655. Argued May 2, 1995 (Calendar No. 5). Decided August 15, 1995.

The Detroit City Council brought an action for mandamus in the Wayne Circuit Court against Coleman A. Young, Mayor of the City of Detroit, seeking to compel the mayor to present a comprehensive budget-deficit plan supported by documentary information for fiscal year 1989-90. The court, Richard C. Kaufman, J., granted partial summary disposition for both parties, holding that the mayor was required to submit budget recommendations to the city council, but did not need to obtain its approval before implementation, and that the recommendations did not need to be accompanied by supporting information and documentation. The Court of Appeals, CAVANAGH, P.J., and GRIFFIN and JANSEN, JJ., in an opinion per curiam, affirmed the determination that *supporting information was not necessary*, but reversed regarding the question of council approval, holding that such approval must be obtained before implementation of any deficit-reduction proposal (Docket No. 138732). The mayor appeals.

In an opinion by Justice LEVIN, joined by Chief Justice BRICKLEY, and Justices CAVANAGH, BOYLE, and MALLETT, the Supreme Court *held:*

While city council approval is required before specific budget appropriations can be reduced, the mayor may act to reduce expenditures pending approval of the budget recommendations.

2. Nothing in § 17 precludes the mayor from achieving the goals of the adopted budget at less than the appropriated

amount or from taking steps in advance of action by the city council to prevent escalation of an impending fiscal crisis. The mayor is under no obligation under § 17 to continue to spend money in a manner that may ultimately be dangerous to the city's financial health by spending up to appropriated amounts. Rather, the mayor may stop spending, subject to council approval of the recommendations without violating the UBAA. If the city council fails to approve the mayor's recommendations, the original budget appropriations stand until the mayor and the city council can come to agreement.

Affirmed in part and modified.

Justice WEAVER, joined by Justice RILEY, concurring in part, stated that despite the majority's recognition that § 17 of the UBAA unambiguously requires legislative approval for any budget deviation or alteration of appropriations, apparently in times of financial crisis the majority would give the mayor exactly that power, pending council approval. This remedy circumnavigates the clear intent of the UBAA and principles of separation of powers.

202 Mich App 353; 509 NW2d 797 (1993) affirmed in part.

*Colista, Adams & Palmer, P.C.* (by *Robert W. Palmer*), for the plaintiffs.

*Honigman, Miller, Schwartz & Cohn* (by *Jay E. Brant* and *David B. Nelson*) and *Phyllis A. James,* Corporation Counsel, for the defendants.

LEVIN, J. The question presented is whether the Mayor of Detroit must obtain approval from the Detroit City Council before implementing a savings plan designed to reduce a projected budget deficit. The Court of Appeals held that city council approval was necessary before implementation. We hold that, while city council approval is required before specific budget appropriations can be reduced, the mayor may act to reduce expenditures pending approval of his budget recommendations.

I

In April, 1989, Detroit Mayor Coleman Young

delivered his annual budget message for fiscal year 1989-90. At that time, Mayor Young anticipated a budget surplus of about $9.6 million for fiscal year 1988-89. Mayor Young expressed concern, however, about rising medical insurance costs and uncertainty regarding contract negotiations with labor unions representing the city's civilian and uniformed employees. In June, 1989, the city council adopted the budget for the new fiscal year beginning July 1, 1989.

In his quarterly financial report to the city council, dated December 14, 1989, Budget Director Walter Stecher indicated that, as of the quarter ended September 30, 1989, the city faced a projected budget deficit of between $49 million and $60 million for fiscal year 1989-90. On January 16, 1990, Mayor Young issued a press release, stating that he was ordering "immediate reductions in City spending to save $28 million by the end of the fiscal year June 30 . . . ."

A savings plan was implemented calling for the layoff of 722 city workers (including 500 police officers), a hiring freeze, the cancellation of nine new police training classes, a delay in purchasing new police vehicles, reductions in overtime, and restrictions on city employee travel. In response to the mayor's announcement, the city council unanimously passed a resolution asking the mayor to submit a deficit-reduction plan, including all necessary budgetary amendments, and supporting information detailing the effect of the proposed amendments on city programs and services.

Budget Director Stecher wrote to the city council, advising that the necessary budget transfers would be forthcoming within two weeks. He indicated that the transfers would not represent all the actions that would be taken to eliminate the budget deficit, but merely would reflect the admin-

istration's first steps implementing the savings plan. Stecher met with the council several days later, at which time he revealed that the city's deficit was actually $81 million. The council once again requested a comprehensive deficit-elimination proposal from the mayor and Stecher.

During the last two weeks of January, 1990, Stecher submitted a series of budget recommendations to the council that would reduce appropriations for personnel by $5,806,800, and defer payment of $11,750,000 for automotive equipment until the following fiscal year. Also transmitted were amendments for increasing appropriations for lay-off benefits of $1,000,000, employee hospitalization of $4,806,800 and $1,700,000, worker's compensation of $4,000,000, and the public liability reserve fund of $5,050,000, all of which were projected to run deficits.

In February, Stecher transmitted proposed amendments for transferring appropriations within the police department of $7,470,000 by reducing appropriations for fringe benefits and certain new hiring, and by increasing appropriations for the criminal investigation division, the police executive division, the personnel bureau, and the management bureau.

All these recommendations were rejected by the council on January 26, 1990, on the basis that they did not constitute a comprehensive savings plan and because they were not accompanied by sufficient supporting information.

The council passed a second resolution, once again asking for "a comprehensive proposal to amend the 1989-90 Detroit City budget to address the entire eighty-one million projected budget deficit" and requesting a response by February 1. This resolution was followed by a letter from City Coun-

cil President Maryann Mahaffey to Mayor Young reiterating the council's demands.

Mayor Young responded to the city council on February 6, 1990, asking for timely action on the previously submitted budget recommendations.[1] Three days later, the council rejected "the three budget transfer requests tendered by the administration purportedly for the purpose of budget deficit reduction plans already implemented by the Executive Branch," and again requested that new recommendations, along with supporting information, be submitted to the council by February 26. This rejection was followed by a letter to Mayor Young from Council President Mahaffey in which she stated that the council's rejection of the amendments was not on the merits, but that the "Council has a very fundamental difference of opinion with the Administration on the role of Council in a savings plan/budget amendment procedure."[2]

---

[1] The mayor observed concerning his savings plan:

> Many of the elements of the savings plan are designed to curb spending that is projected to be in excess of budgetary limits. This means that some measures do not generate any appropriation surplus, but they reduce a projected deficit. Because they do not generate a surplus, they do not require Council action.

The mayor said that "[t]he amendments submitted to you represent all the areas requiring your action in the entire series of steps taken thus far to diminish the projected budget problem by the $28 million estimated savings." Finally, Mayor Young noted that, although the $81 million figure was no more than a "projection," a sizeable deficit was probable, thereby requiring additional plans for savings in excess of $28 million later in the fiscal year, to be supplemented by a withdrawal from the budget stabilization fund. See MCL 141.441 *et seq.*; MSA 5.3230(1) *et seq.*

[2] Council President Mahaffey referred to this Court's decision in *Detroit City Council v Stecher*, 430 Mich 74; 421 NW2d 544 (1988), and stated that the council interpreted the case to mean that

> once a budget deficit is projected it is the Mayor's responsibility

In response, the mayor resubmitted his budget recommendations for the savings plan. These recommendations were again rejected by the council on March 7.[3] The council then filed this action for mandamus in the circuit court to compel Mayor Young to present a comprehensive plan supported by documentary information. The circuit court partially granted both parties' motions for summary disposition, pursuant to MCR 2.116(C)(10), and held that the mayor must submit budget recommendations to the city council, but need not obtain its approval before implementation. In addition, the court held that the mayor need not accompany his recommendations with supporting information and documentation.[4]

The Court of Appeals affirmed in part and reversed in part.[5] The Court affirmed the circuit court's determination that supporting information was not necessary, but reversed regarding the

to make recommendations on a "savings plan" to Council. Once the Mayor and Council agree on what the savings plan will be, the budget amendments will be generated to reflect fiscally the savings plan that is being operationally implemented.

[3] The council resolution rejecting the recommendations stated:

City Council believes that it is clear in the State of Michigan Uniform Budgeting and Accounting Act, the City Charter and the City Council vs Stecher court case that it is council's responsibility to act on recommendations from the mayor that would reduce a projected budget deficit, not just on the resultant budget transfers.

[4] On April 4, 1990, the circuit court issued a writ of mandamus ordering the mayor and Stecher to submit recommendations within seven days to the council that would prevent expenditures from exceeding revenues for the fiscal year. The next day, the mayor resubmitted budget recommendations identical to the ones offered on March 7. The council rejected these submissions on April 11.

Following delivery of the mayor's budget message for fiscal year 1990-91 and budget hearings, on May 4, the mayor again submitted the budget transfers. These were finally approved by the council on May 25, 1990.

[5] 202 Mich App 353; 509 NW2d 797 (1993).

question of council approval, holding that such approval must be obtained before implementation of any deficit-reduction proposal. In so ruling, the Court relied on § 17 of the Uniform Budgeting and Accounting Act (UBAA), MCL 141.437; MSA 5.3228(37).[6]

The Court of Appeals disagreed with the circuit court that the proposed savings plan did not include "deviations" from the original budget under § 17 because certain provisions of the plan involved mere refusals to expend appropriated

[6] Section 17 provides:

Except as otherwise provided in section 19, a deviation from the original general appropriations act shall not be made without amending the general appropriations act. The legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined. An amendment shall indicate each intended alteration in the purpose of each appropriation item affected by the amendment. The legislative body may require that the chief administrative officer or fiscal officer provide it with periodic reports on the financial condition of the local unit. If, during a fiscal year, it appears to the chief administrative officer, or the fiscal officer in local units which have not elected or designated a chief administrative officer, or to the legislative body that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and the proceeds from bonds or other obligations issued under the fiscal stabilization act or the balance of the principal of these bonds or other obligations, the chief administrative officer or fiscal officer shall present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both. The recommendations shall recognize the requirements of state law and the provisions of collective bargaining agreements.

funds.[7] The Court observed that the plan as a whole consisted of proposals for increases and decreases in particular appropriations. The Court held that since these changes had not been authorized under the previously adopted budget, the provisions of the plan constituted deviations requiring city council approval.

The Court added that § 17 of the UBAA requires city council approval of the mayor's deficit-reduction program before implementation because the statute clearly states that, if it appears that there will be a budget deficit, the mayor must make recommendations that "if adopted" would eliminate the budget shortfall. The Court also reasoned that permitting the mayor to proceed with implementation of a plan without first obtaining council approval raised the possibility that the executive actions would become retrospectively illegal if the budget recommendations subsequently failed before the council.[8]

We granted leave to appeal.[9]

## II

### A

The mayor contends that the only issue presented is whether the mayor needed city council "approval prior to implementing decisions not to spend the full amount of funds previously appropriated or not to spend in excess of appropria-

---

[7] 202 Mich App 358.

[8] *Id.* at 358-359.

[9] 448 Mich 851 (1995). The Court of Appeals noted that the issues are moot, but nevertheless addressed the issues because they are of public significance and may recur. Citing *In re Ford,* 187 Mich App 452, 454; 468 NW2d 260 (1991). 202 Mich App 355.

This Court has decided to address the issues because they are capable of repetition while evading review. *Socialist Workers Party v Secretary of State,* 412 Mich 571, 582, n 11; 317 NW2d 1 (1982).

tions."[10] The mayor contends that, because an appropriation is not a "mandate" to spend, he was not obliged to obtain council approval before implementing those portions of the savings plan constituting decisions not to spend appropriated amounts. The Court of Appeals rejected this characterization because it concluded that the mayor's savings plan consisted of more than the mere refusal to spend. We agree insofar as this particular savings plan would have resulted in transfers between budgeted items (deviations) or reductions in budgeted appropriations without council approval.

Insofar as the savings plan included "deviations" from the city budget for fiscal year 1989-90, city council approval was required under § 17 of the UBAA. The first three sentences of § 17 provide:

> Except as otherwise provided in section 19, a deviation from the original general appropriations act shall not be made without amending the general appropriations act. The legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined. An amendment shall indicate each intended alteration in the purpose of each appropriation item affected by the amendment.

Thus, reallocation or diversion of previously budg-

[10] The parties have not raised or briefed the question of the city council's standing to sue under the UBAA. In *Stecher,* n 2 *supra* at 80-81, this Court concluded that it would not address the question whether the Attorney General is given exclusive enforcement power under the statute. See MCL 141.440; MSA 5.3228(40). See also *Rayford v Detroit,* 132 Mich App 248; 347 NW2d 210 (1984). In the absence of a claim and briefs regarding the city council's standing, we do not address this issue.

eted funds from one use to another could only have been accomplished with council approval.[11]

The opening three sentences of § 17, concerning deviation or alteration in the purpose and use of an appropriation item, are immediately followed by one sentence providing that the legislative body may require the executive to provide it with periodic reports on the financial condition of the city or other local unit.

The next three sentences concern the procedures to be followed when there must be a reduction in appropriations to meet a revenue shortfall:[12]

> If, during a fiscal year, it appears to the chief administrative officer, or the fiscal officer in local units which have not elected or designated a chief administrative officer, or to the legislative body that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and the proceeds from bonds or other obligations issued under the fiscal stabilization act or the balance of the principal of these bonds or other obligations, the chief administrative officer or fiscal officer shall present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues

[11] Thus, council approval was required for the proposed reduction of appropriations for personnel by $5,806,800 and for deferring payment of $11,750,000 for automotive equipment until the following fiscal year. Similarly, council approval was required for increasing appropriations for lay-off benefits of $1,000,000, employee hospitalization of $4,806,800 and $1,700,000, worker's compensation of $4,000,000, and the public liability reserve fund of $5,050,000.

[12] One of the purposes of § 17 is to promote uniform budgets and avoid deficit spending. See *Rayford,* n 10 *supra.* Although the statute refers to the procedures to be followed when there is a revenue shortfall, it is unclear whether the city's deficit was caused by such a shortfall or an excess in expenditures. The parties have proceeded on the basis that § 17 governs the resolution of this case. They have not raised or briefed the question whether § 17 is applicable in the circumstances of the instant case.

for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations. to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

Thus, by its terms, these sentences of § 17 require, first, that the mayor develop and submit recommendations for reducing expenditures when a revenue shortfall has been identified, and, second, that the city council approve or reject the recommended reductions in appropriations.

B

We agree with the mayor that an appropriation is not a mandate to spend.[13] As executive, the mayor has the responsibility and the discretion to implement programs while taking advantage of "efficiencies and economies" that will save money in their operation.[14] Nothing in § 17 precludes the

---

[13] [A]n appropriation of a larger amount than is necessary for a particular purpose does not obligate the city to pay or expend the full amount. [64 CJS, Municipal Corporations, § 1888, p 454.]

[14] See OAG, 1989-1990, No 6,607, pp 271-272 (December 5, 1989) discussing the term "efficiencies and economies." Const 1963, art 5, § 20, states that "[n]o appropriation shall be a mandate to spend." The Attorney General has interpreted this provision to prevent state departments from reducing the gross amounts appropriated for specific programs.

In *Opinion of the Justices to the Senate,* 375 Mass 827; 376 NE2d 1217 (1978), the Supreme Judicial Court of Massachusetts discussed the discretion left open to executives to implement programs in the context of the power of that state's governor. The Massachusetts court stated,

Inasmuch as it is the function of the executive branch to expend funds, it must be implied that the "supreme executive

mayor from achieving the goals of the adopted budget at less than the appropriated amount.

Nor does § 17 preclude the mayor from taking steps in advance of action by the city council to prevent escalation of an impending fiscal crisis. Section 17 speaks only of deviations or alteration in the purpose or use of appropriations and the process that must be employed in redefining the city's official budget priorities when there is a shortfall in revenue. The mayor is under no obligation under § 17 to continue to spend money in a manner that may ultimately be dangerous to the city's financial health by spending up to appropriated amounts. Although other city ordinances, charter provisions, state laws, or collective bargaining agreements might require the city to expend some minimum amount of money, an appropriation alone does not. Thus, the mayor may stop spending subject to council approval of his recommendations without violating the UBAA.

In *Detroit City Council v Stecher*, 430 Mich 74; 421 NW2d 544 (1988), the Court reviewed an attempt by the Detroit City Council to amend unilaterally the mayor's budget recommendations by transferring appropriations before submitting them to the mayor for final approval. This Court

magistrate," as head of one of the three coequal branches of government, is not obliged to spend the money foolishly or needlessly. The executive branch is the organ of government charged with the responsibility of, and is normally the only branch capable of, having detailed and contemporaneous knowledge regarding spending decisions. The constitutional separation of powers and responsibilities, therefore, contemplates that the Governor be allowed some discretion to exercise his judgment not to spend money in a wasteful fashion, provided that he has determined reasonably that such a decision will not compromise the achievement of underlying legislative purposes and goals. [*Id.* at 836.]

While not expressly binding on local government, the principles and policies embodied in Const 1963, art 5, § 20, and the above-cited case, apply to local government.

reviewed the budget appropriation process, including § 17 of the UBAA and various sections of the Detroit City Charter,[15] and concluded that such unilateral action was not authorized.[16] The Court held that, under those provisions, the council may only accept or reject the mayor's budget recommendations.[17] In so holding, the Court discussed the balance that was struck between the executive and legislative powers by § 17 of the UBAA:

[15] The charter provides:

At any time during the fiscal year upon written request by the mayor, the city council may, by resolution, transfer all or part of any unencumbered appropriation balance among the programs, services or activities within an agency or from one agency to another. [§ 8-211.]

The Court observed in *Stecher, supra* at 88-89, that § 8-211 "is primarily a procedural provision that specifies the process by which the city budget may be amended during the course of a fiscal year." This Court found no conflict between the provisions of the UBAA and the Detroit Charter. *Id.* at 89.

[16] This Court said:

When, during a fiscal year, it becomes apparent that the budget of the City of Detroit will not balance, the mayor has the responsibility and the power to make recommendations to the city council for appropriations transfers in order to achieve a balanced budget to comply with the provisions of the UBAA. MCL 141.437; MSA 5.3228(37). The council may only accept or reject the proposals as submitted by the mayor. *Id.,* Detroit Charter, § 8-211. Accordingly, we hold that the council may not unilaterally amend these proposals before submitting them to the mayor for final approval and implementation. [*Id.* at 77.]

We do not read the last two words in the last sentence—"and implementation"—quoted above as a decision by this Court that the mayor may not partially close the checkbook during a fiscal crisis before council approval of his recommendations for reducing appropriations. Quite obviously, the mayor cannot implement a *recommendation* for reducing appropriations that *had* been previously enacted by the city council until the *recommendation* for reduction is approved by the city council. It does not follow that he may not reduce expenditures to avoid exacerbating the fiscal crisis while he is considering what to recommend and the council is considering his recommendations.

[17] *Id.* at 88.

The council's power to reject the recommendations of the mayor is consistent with the phrase "if adopted" in the above-quoted section [§ 17 of the UBAA]. This power does not, however, require the ability to unilaterally amend the recommendations. It must be noted that the Legislature has placed the most important requirements for the content of the budget amendment in the portion that describes the responsibilities of the mayor in formulating recommendations. Only the mayor is responsible for ensuring that the proposals submitted "would prevent expenditures from exceeding available revenues for that current fiscal year." Similarly, the mayor is solely responsible for recommending proposals for "reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both."[18]

Reasoning from *Stecher,* the Court of Appeals said that the implication of the limitation on the city council's power to amend was that council approval was necessary in order to go forward with implementing deficit-reduction proposals.[19] We read § 17 somewhat more narrowly than the Court of Appeals. Section 17 unambiguously requires legislative approval for any budget deviation or alteration of appropriations, and for any budget recommendation from the mayor designed to reduce appropriations to balance the city's budget.[20] In advance of legislative adoption, during times of fiscal crisis, the mayor nevertheless has

[18] *Id.* at 87.

[19] 202 Mich App 359.

[20] The District of Columbia Court of Appeals similarly concluded in *Barry v Bush,* 581 A2d 308 (DC App, 1990). Section 31-104 of the DC Code provided that both the mayor and the council may establish the maximum amount of funds that could be allocated to the district's

the power and duty to take measures to avoid exacerbating a projected budget shortfall. If the city council fails to approve the mayor's recommendations, the original budget appropriations stand until the mayor and the city council can come to agreement.[21]

Underlying § 17 is the notion that the legislative body is a necessary player in any effort to reorganize a municipality's budget priorities. Even in times of financial crisis, the determination of budget priorities is a collaborative process between municipal administrative and legislative officers under the UBAA. However, while § 17 prevents the executive branch from unilaterally modifying the city's budget and appropriations, it does not preclude executive action designed to prevent the city from continuing to operate at a deficit pending city council approval.

The decision of the Court of Appeals is affirmed in part and modified consistent with this opinion.

BRICKLEY, C.J., and CAVANAGH, BOYLE, and MALLETT, JJ., concurred with LEVIN, J.

WEAVER, J. I concur in that portion of the majority opinion that affirms the reasoning of the

board of education. The court held that any attempt to deviate from the previously established maximum in the budget required the participation of both the mayor and the council. Thus, the mayor could not unilaterally reduce the board's budget in times of fiscal crisis, because such an act would be establishing a new maximum for the board without council participation.

See also *In re Broderick v New York City,* 295 NY 363, 370-372; 67 NE2d 737 (1946) (under a city charter provision, agency directors may not transfer an appropriation from one line to another without Board of Estimate approval).

[21] In the instant case, the city council eventually approved Mayor Young's recommendations after conducting hearings on the budget for the following fiscal year. See n 4. Therefore, we need not opine what might or should happen if the city council and the mayor remain permanently at loggerheads over the proposed budget recommendations.

Court of Appeals and holds that city council approval is required before specific budget appropriations can be reduced.

Where I differ from the majority is in its conclusion that despite the recognition that § 17 of the UBAA "unambiguously requires legislative approval for any budget deviation or alteration of appropriations" (*ante* at 683) "the mayor nevertheless has the power and duty to take measures to avoid exacerbating a projected budget shortfall." *Id.* at 683-684. Despite the majority's further recognition that the executive branch cannot unilaterally modify the city's budget and appropriations, apparently in times of financial crisis the majority would give the mayor exactly that power, pending council approval. This remedy circumnavigates the clear intent of the UBAA and principles of separation of powers. For those reasons I do not join in part II(B) of the majority opinion, and would affirm the result of the Court of Appeals.

RILEY, J., concurred with WEAVER, J.